Carr, J.
This is the case of a naval officer of the revolution, suing for his half pay. I shall take it for granted, that he stands on the same ground with an officer of the state line.
Two questions were presented, and were most ably and elaborately argued : 1st, Did Lilly serve to the-end of the war ? 2nd, If he did not, is he entitled to half pay, under the act of 1779, as a supernumerary officer?
Upon the first question, taking all the circumstances into view; the high reputation of Lilly for zeal and activity; *528 his appointment as one of the board of officers; the report of that board in his favour; the application of himself with others, at an early day, when every thing was fresh, to be permitted to establish his claim, professing to be then ready to do so; the, long lapse of time since; and the testimony of five witnesses, that they believed he served to the end of the war : taking all these things into view, I feel much inclined to think, that the safest conclusion would be, to say, that he did serve to the end of the war: but, though inclined to this conclusion, I cannot rest upon it, with the confidence necessary to make it the ground of my decision. I am, therefore, reluctantly driven to the examination of the second question—I say reluctantly—for I believe there are few men, less disposed than myself, to disturb the decisions of this court, made by the enlightened judges who have gone before us. Cases, however, do sometimes arise, in which our 'respect for their decisions must yield to a more imperious duty. It is under a strong feeling of this duty, and a due sense of the responsibility of this step, that I proceed to the discussion of this question.
Let us advert to the words of the act of 1779. (Here the judge quoted the act verbatim.) It is clear to me, that it was not the effect or intention of the act of 1790 to repeal this act of 1779; and this was properly admitted by'the attorney general (whose zeal and ability in the discharge of his duties, deserve all praise.) It is by this act then, that the claim of the supernumerary must stand or fall.
Before we come to a strict analysis of the words of this law, let us advert for a moment, to the situation of the country at its passage. We were in the fourth year of the revolutionary war; a gloomy period, strongly marked with danger, difficulty, and depression: Virginia, without money, except a paper currency fast hastening to its dissolution, had to raise and keep on foot troops, for continental service and state defence : her armies and navy had been in the service several years, almost without pay or clothing, and their situation was wretched indeed. What was the *529 stale to do ? She had but one resource; to draw largely on the future ; to promise liberality; to hold out alluring pros-peels. The numerous expedients she resorted to for that purpose, may be seen by all who will turn to the laws of that day. To retain in the service experienced officers, was a most important object; nor was it found easy to effect this, after the first fire of enthusiasm had been cooled "by three years’ suffering, while their present pay was almost nothing, and the ability of the state to make good its promises, was a problem only to be solved by the event of the struggle. Hence, we find various laws adding new inducements as the difficulty increased; promising additional bounties, and lands, and half pay for life, and other advantages. To this class, the law before us belongs. It promises half pay for life : let us inquire to whom, and on what terms ? First, to officers in service, who shall serve to the end of the war. If the law had stopped here, there could have been no doubt. All officers found in service at the close of the war would have been clearly entitled. But there was another class, for whom the assembly felt it to be just and thought it important to provide, “ all such officers, who have, or shall become supernumerary,” &tc. What is a supernumerary ? He is just as much an officer as any other: but his battalion, or corps has been reduced or disbanded, or so arranged in some way, as to leave him, for the present, no command; and the state, to save the expence of full pay and subsistence, discharges him from actual service. This is no reproach to the officer, and does not in the slightest degree affect his standing : he is supernumerary to-day, because it suited the purposes, or was compelled by the necessities of the state : to-morrow she calls him to the camp, and he is an officer in actual service. At the passage of this act, the history, and the laws of the period tell us, there were a great number of supernumeraries; men infcriour to none; men to whom the state was as deeply indebted for past service, aud whose future services she deemed it as important to retain, as those of the officers in actual service: *530 for these men, under the name of supernumeraries, in con- .... „ . . 7 . . . tradistinction to officers m actual service, the law meant to provide : “ all such officers, who have, or shall become supernumerary on the reduction of any of the said battalions, and shall again enter the said service, if required so to do, in the same -or any higher rank, and continue therein until the end of the war, shall be entitled to half pay during life,” &c. Now, I ask, how does this sentence strike the plain common sense of every man ? And we must not forget, that it was to the common sense of the country this law was addressed; and that an important object of it was, to hold out inducements to those in the service, to continue there, and to others to enter into it. Did the assembly mean to say to the supernumeraries, we have put you out of actual service to suit our convenience: we hold you bound to return the moment we call you, and if we should choose to call you into service again, and you continue in it to the end of the war, you shall have the half pay; but if we do not recall you, you shall have nothing ? Would this have heen just ? Would it have had the effect intended, to induce the supernumeraries to hold their commissions ? Or can the words be tortured into such a meaning ? If it had not been intended to ¡provide for supernumeraries, not again called into service, Iwhy mention them at all by that name ? When they enter the service again, they cease to be supe2’numeraries: they! are officers in service, and if serving at the end of the war, they come directly within the first clause of the law, which says, “ that all officers who shall continue to serve to the end o|f the war, shall be entitled to half pay.” But let us look again at the law. “ All officers who are now supernumerary, and shall again enter the service if required so to do.” ¡What do these words “if required so to do” mean ? Are they surplusage ? If not, they must operate as a condition, limiting the effect of the preceding words: for example, strike out the words “ if required so to do,” and the sentence is, “ all supernumeraries, who shall again enter the service &c. shall be entitled to half pay”—making *531 the re-entering into service, an absolute, unqualified prerequisite to the claim of half pay. Insert the words, and it is “ all supernumeraries if required so to do,” &c. shall have half pay—making requisition a preliminary, a condition precedent, that without which the failure to re-enter the service, should present no objection to the claim of half pay. Is not this the plain vernacular, as well as legal meaning ? Does not the conjunction if, always import a condition? The plain meaning of the sentence, then, (to my understanding) is this: Supernumeraries, if never again called into service, are entitled to half pay, to commence from the determination of their command; but, if again called, they forfeit their claim, unless they enter again info the service, and continue therein to the end of the war. And was it not just in the legislature, to place supernumerary officers on this footing ? To hold out to them this inducement to retain their commissions? To say to them, “you have served us faithfully, until we put you out of actual service, for no fault of yours, but for our convenience. This, however, shall do you no injury: We do not know how soon we may want your services again; we, therefore, retain the power of re-calling you into service$ if we do so, you will then stand on the ground of all other officers : so that, either as supernumeraries, not again called on, or as officers serving to the end of tho war, you shall have a right to claim half pay.” Ought we to put such a construction on this law, as would give the right, after all actual hostility was over, to reduce her armies to a regiment or a company, discharge the great mass of her officers as supernumerary, and then repel llieir claim to half pay, by telling them, you are supernumeraries, never called again into service ; and, therefore, not within the law. To me it seems, that to suppose the legislature meant, under the cover of the words used, to conceal such a power, would be to dishonour them, by a charge of premeditated deception. I beg to be distinctly understood : I mean to express simply what I should feel, understanding the words of the law, to hold out the meaning, *532 which to me they seem to do. I have (and I trust I need hardly say so,) the highest possible respect, both for those judges who heretofore have, and for my brethren who now hold opinions opposite to my own, on this subject. We differ as to the meaning of the law; that is all.
But, it is said, a supernumerary could not again enter the service, without being required, nor refuse to enter, if required ; and that, therefore, the words, “ if required so to do,” are mere surplusage. It is clear, that a supernumerary could not re-enter the service, without being again called to it; and this, under the construction against which I contend, would make his case the harder. Whether, being required to re-enter, he could refuse, I shall not stop to inquire; remarking only, that if the ordinance of 1775, under which the power of coercion is claimed, was still in force, it could apply only to troops raised, and officers commissioned, under later laws. But suppose I admit the premises, does the conclusion (that the words are surplusage) follow? Say, that a supernumerary could not re-enter the service, without being required, and could not disobey a requisition, is it impossible that the assembly might mean to pass a law, giving him a right to half pay, if never again called into service ? And are we at liberty, upon the assumption of this impossibility, to strike out of the law the words, “ if required to do so ?” Words so significant, that it is impossible to suppose, they were used through inadvertence; so clear, that it seems difficult to mistake them; and so operative, that they change the whole effect of the law. It is also said, that if my construction be given to the law, a supernumerary re-called into service, and again becoming supernumerary, and then, not serving to the end of the war, would still be entitled to half pay; and thus the emphatic words of the law, “ and continue therein to the end of the war,” would be rendered superfluous and useless. I cannot conceive the correctness of this conclusion. My construction is this: that a supernumerary, if never required to reenter the service, is entitled to half pay; if required, that *533 he must re-enter: then, ho is an officer in service, and like all others in service, ho must continue therein to the end of the war, unless he is again put out of service; in that case he is again a supernumerary; standing precisely on the ground occupied by every other supernumerary; subject to he re-called, and if re-called, hound to serve through the war; but if never re-called, entitled to half pay. In this, there seems to me, nothing inconsistent with the words or spirit of the law or the justice of the case; hut every thing in harmony with them all.
Let us now look to the contemporaneous exposition of this statute, for this is said to ho fortissima in lege. In December 1781, a memorial of the officers, was referred by the legislature, to a committee of their body, of which Patrick Henry was chairman. Among many resolutions reported by the chairman in favour of the memorialists, was the following: “ that they are entitled to half pay, commencing from the termination of their command, on their becoming supernumerary from the reduction of the battalions or corps to which they belonged; subject, however, to be called upon, to take command in the same, or higher rank; and to forfeiture of their pay, on refusing to take command when thereto required.” Here we have an exposition of the act, by men who assisted most probably in forming it; an exposition given but little better than two years after its passage. Did the legislature disapprove of this construction ? No ! for upon the subject of these very resolutions, at the same session, it passed a law, in which it recognized die right of supernumeraries to half pay : I mean the 10th section of the act to be found in 10 Hen. stat. at large, 466. “ Whereas by the reduction of battalions and corps in the state service, a considerable number of officers have become supernumerary : He it enacted, that a return of all the state officers shall be made to the next assembly, wherein the corps, the rank of each officer, the date of his commission, the number of men at first raised in each corps, number of men when reduced, and time when reduced, *534 shall be particularly specified by the executive; and the • , Í. , . , executive are hereby empowered and required, to set on foot proper inquiries, to discriminate such officers as by unworthy conduct, or by any means whatever, may be thought unfit, to be entitled to half pay.” Thus explicitly recognizing the right of supernumeraries to half pay, unless forfeited by unworthy conduct, or some other means, which, in the opinion of the executive, might render them unfit to be considered as entitled; treating it as a right, then vested, and existing, where not affected by some extrinsic circumstance: and this, be it remembered, was in 1781; more than twelve months before the close of the war. In consequence of this law, a board was formed, who reported to the executive a list of the officers, as entitled to half pay; and the executive approved of it, and sent it to the auditors for their guide in issuing warrants. This, also, was before the close of the war, and shews that the executive of that day thought with the legislature, that the supernumerary was entitled to half pay, without being re-called, and serving to the end of the war. In May 1783, just after the peace, .the assembly passed an act (11 Hen. stat. at large, p. 265.) ■directing the auditors to issue to such officers of the state •line and navy, as by law are entitled to half pay, their warrants for the same, and to return the amount of said warrants to the next assembly, that adequate funds might be ' provided for the discharge of the same. This act is unquestionably based upon the idea, that there were supernumerary officers entitled to half pay at a period prior to the end of the war. And under this act, warrants were issued to supernumeraries not again called into service. In December 1783, the auditors addressed a note to the attorney general (Edmund Randolph) requesting his opinion, whether the act of 1779'gave half pay to supernumeraries, though not called again’into service: he answered, “ I never doubted, that the just construction of the act warrants the claim of supernumerary officers to half pay, though they never returned to service, provided they never refused to *535 do so.” Here is the law officer of the commonwealth, spedaily appointed to watch over and protect her rights, dedaring that he never had a doubt of the right of supernumeraries to half pay. This is a mass of contemporaneous exposition of the highest and most imposing character; it is ex viscerihus temporis. Coming to the judiciary, the whole general court were in favour of the right, and so was the venerable chancellor Wythe, whose argument on the subject, seems to me irresistibly strong. On the other side, are the decisions of this court clearly given against the right. If those opposing decisions and opinions have no other effect, I think they may at least bo said to leave the subject opon; and this has reconciled me the more to taking it up and forming an opinion for myself upon it. This I have done to the best of my ability, and am in favour of affirming the judgment.
Green, J.
I have, from time to time, since this case was last argued, devoted all my faculties to its examination, not only on account of the intrinsic difficulties of the question which it presents, and of the important interests involved in the decision of it, but on account of the remarkable difference of opinion respecting it, existing for more than forty years in the legislative and judicial departments of the government. The question is, whether the supernumerary officers of the state line and navy of Virginia, (who were put upon the same footing, in that respect, as was decided in Markham’s case) are entitled to half pay for life, although not serving to the end of the war, if not required to do so. For, captain Lilly did not serve to the end of the war, in the sense of the act of 1779, even if the war were to be considered as ending with the capture of lord Cornwallis’s army.
I thought, until very recently, that there were strong motives to influence the legislature in making a discrimination between those who served to the end of the war, and supernumeraries, (especially the great number becoming so, by *536 the reduction of fourteen regiments or battalions, in 1777, from ten to eight companies, and never again called into the service), and that such a discrimination had been made: That neither the words “ command or service,” nor the provision for supernumeraries, in the act of 1779, were rendered nugatory by that construction; because the words, “ command or service” might well be applied distributively, to officers, who, when in actual service, had a command, and such as had no command, as chaplains, physicians, &c. and because a special provision was necessary for supernumeraries, if they were intended to be provided for in any case whatever; since none such, whether then being or thereafter becoming supernumerary, could claim under the former part of the provision, as they could not claim as having served “ henceforth [from the passing of the act] or from the time of their being commissioned, until the end of the war:” That no subsequent act of legislation, had varied or settled the construction of the act of 1779: and that no construction could be put upon the words of the act of 1779, which would not have the effect of rendering nugatory, or superfluous and unmeaning, either the expression, “ if.required so to do,” or the expression to serve to “ the end of the war;” to secure which service, seemed to be the whole object and policy of the statute. And if one or the other of those expressions were to be rejected as mere surplusage, I could not hesitate between them. This would be the necessary consequence, if the expression, “ if required so to do,” referred to and qualified only the preceding expression, “ and shall again enter into the said service,” and not the subsequent expression also, “ and continue therein until the end of the war;” in which case, the last expression would impose an absolute condition, not qualified by the expression, “ if required so to do.” And this was the natural effect of the words in the context in which they stood.
Subsequent reflection has satisfied me, that I was mistaken in this last particular. It does much less violence to the language of the statute, to consider the expression, “ if required *537 so to do,” as pervading and qualifying the whole sentence, than to reject it as mere surplusage; to make it read, in effect, as if those words were transposed to the beginning or end of the sentence, thus: “ and shall, if required so to do, again enter into the said service, in the same or any higher rank, and continue therein until the end of the war;” or, “ and shall again enter into the said service, in the same or any higher rank, and continue therein until the end of the war, if required so to do.” The expression, “in the same or any higher rank,” fortifies this construction: it seems to have been inserted for the purpose of preventing the government from requiring an officer to enter the service again, in a rank inferiour to that in which he had before served, and thus, if he refused, to impose upon him the forfeiture of his right to half pay. These words, taken in connexion with the words, “if required so to do,” and treated in the same way, would give a meaning to the whole sentence, as if it were written, “ and shall again enter into the said service, and continue therein until the end of the war, if required so to do, in the same or a higher rank:” and this, I think, is the true construction of the statute. Captain Lilly was, therefore, entitled to half pay for life.
Has any thing occurred to impair that right? The statute of limitations does not; this is not any action, or in the nature of any action, limited by that act: it is a claim, founded upon legislative acts, presented in the peculiar form prescribed by law. Nor does the question arise, whether the joint resolution of the two houses of the general assembly of December 1783, prohibiting the issuing of warrants or certificates, for half pay, until the further order of the general assembly, and which was repealed by the act of 1790, only so far as related to the officers of the state line, who had served to the end of the war, is an impediment to the claim of Lilly's representatives; for that resolution did not embrace the officers of the navy. The warrant ought, in point of law, to have been issued when applied for,
*538 The only question which remains is, whether interest ought to be allowed upon the arrears of half pay? I do not think it should. The real and intrinsic difficulty in these questions, in respect to the half pay of officers of the state line and navy, not serving to the end of tire war; the conflicting opinions, in the judiciary and legislative departments, on that subject; and the final decision of the court of appeals, against those claims; excuse the government from the imputation of any wrongful delay in satisfying them; and the laches is on the part of the claimants, or at least on the part of such of them as might, without impediment, have resorted to the courts of justice.*
*539 Coalter, J.
This is a case of great consequence to the State, as well as to the individual who is the appellee in the case, inasmuch as it involves the interesting and much agitated question, whether a supernumerary officer of the revolutionary army, in the state line, who was never called into service, after he became supernumerary, is entitled to half pay, under the act of 1779?
Lilly, the intestate of the appellee, was a captain in the navy, commissioned before the adoption of the constitution, in January 1776, and also by the governour afterwards, in August 3776. He died in 1798, and administration was granted to John Chowning (who intermarried with his daughter) in February 1826, who soon thereafter exhibited his claim to the auditor.
The attorney for the commonwealth, has pleaded the statute of limitations, as a bar to the claim; and has also relied on the lapse of time, as evidence of payment or abandonment of claim.
As to the former; as the claim rests upon the laws of the land, and the commission under the seal of the commonwealth, without examining the other objections taken to the plea, I think it cannot be pleaded as an absolute bar to the claim. As to the presumption of payment, I think the detail which will be given hereafter, of the resistance of the state, for a long time, to all claims for half pay, even in case of service during the war, will furnish conclusive proof that he could not have been paid. And as to abandonment of his claim, he may have done so, in despair of ohtaining it; but there is no evidence that he ever doubted of its justice. In May 1784, he joined with the other officers of the army and navy, in a strong memorial and remonstrance to the legislature, against the resolution of December preceding, which inhibited the auditors from issuing warrants for half pay, according to the lists certified to them by the executive, as their guide in issuing such warrants; but without success, lie witnessed the' struggle carried on by many of those officers, before the courts of justice, in the years 1791, 1792, *540 and 1793, (as will hereafter be in some measure detailed); and soon after sunk into his grave, unrewarded, if he was entitled to it, for those meritorious services, which the witnesses concur in saying he rendered during the war.
I am strongly inclined to think, that captain Lilly served from 1776, until after the 31st March 1783; on which day, the governour having laid before the council, information from our own delegates in congress, that news of a general peace had been received, and that congress had recalled her armed naval commissions, he is advised to discontinue the armaments for bay defence, and dismiss the navy. I shall not, however, go into the examination of those circumstances, which satisfy me of the great probability of this fact. Nor will I demonstrate, as I think I could, that he served at least until the navy was nearly demolished, being reduced to a single vessel, the look-out boat Liberty, by the act of November session 1781. And although, after that, it was somewhat increased for bay defence, and so continued until April 1783, yet I am now going on the admission that Lilly did not serve after the great reduction above spoken of.
After the reduction of York, the enemy were shut up in their strongholds, in New York and Charleston: so that, with the exception of a contemptible naval force, which occasionally infested our waters, we had’ nothing to fear, until Great- Britain should fit out a new armament against us. This was not expected; inasmuch as sir Guy Carleton, very soon after that event, notified us, that a commissioner had gone to Paris, authorized to negotiate a general peace on the basis of american independence. Until this should take place, however, it was important to keep on foot the continental troops, and, indeed, to fill up the quotas of the states in that line, at the same time that prudence required a diminution of our corps for state defence, in order to economize our means for a future struggle, should that become necessary ; the probability of which, however, was daily diminishing. In pursuance of this policy, the legislature, at the November session 1781, (10 Hen. stat. at large, 499.) di *541 reeled a reduction of the officers of tho stale line, and a consolidation of the troops into one corps, he. which being effected, many officers were rendered supernumerary; and this course was ordered to be pursued, from time to time, as the time of service of the troops expired, which were not to be recruited by new levies; but, on the contrary, laws were passed, authorizing enlistments to be made from the state line into tho continental; and, finally, such of the cavalry as had not ro-enlisted, were ordered to be discharged: so that, on the last arrangement of tho troops by colonel Dabney, in February 1783, very few officers remained in his legion, who could serve, literally, to the end of the war. As to the navy, the act above referred to, reciting that it was necessary to husband the resources of the state, with the utmost economy, and since our finances did not admit of putting the navy on a footing, productive of any public benefit, adequate to its expenditure, directs the officers of every denomination to be reduced, except so many as might be necessary fox the command of the loolc-out boat Liberty.
This act had been preceded by one of May 1780, (10 Hen. stat. at large, 297.) which recites, that whereas it is necessary that no officers should be retained in the marine department, but such as are properly qualified; to effect which reform, the governour is directed to constitute a board to consist of the commissioners of the navy, and six of the captains, the most approved for their ability, who, having been first fixed in their command, should perform that duty. The executive was to select these, and fix them in their command, that they might, with impartiality, proceed to the delicate duties of their appointment. This board was constituted, and made its report; and 1 have no doubt but that captain Lilly, who was not only one of the oldest, but, as all the testimony establishes, among the most meritorious of the corps, was a member of this board.
The legislature furthermore, during tho same session of 1781, and after the act reducing the army and navy as aforesaid, passed the act (10 Hen. stat. at large, 462.) for ad *542 justing the pay and accounts of the officers and soldiers of the Virginia line on continental establishment, and also of the officers, soldiers, sailors and marines in the service of this state; in which, amongst other things, it is provided, that whereas by the reduction of battalions and corps in the state service, a considerable number of officers have become supernumerary, a return of all the state officers shall be made; and the executive was thereby empowered and required to set on foot proper inquiries to discriminate such officers, as by unworthy conduct, or by any means whatever, be thought unfit to be considered as entitled to half pay. This discrimination was made, in part, early in 1782. That which sifted the navy had already been made, as above stated. The legislature, therefore, when they come to speak of the navy, in this act, say, that the officers of the navy as they stand arranged by a late regulation, shall be entitled to the same advantages as the officers belonging to this state in the land service.
The act of 1779, it is admitted on all hands, promises half pay to the officers, as well of the continental as state line, who continued in service to the end of the war. It is true, the officers of the navy are not expressly mentioned in this act; but many subsequent acts, either to be taken as explanatory of this act, or as substantive provisions, extend the same benefit to the navy, as has been decided by us in Markham's case; so that officers of the navy are equally entitled with officers of the state line. The supernumeraries contemplated by the act of 1779, were such as were unavoidably thrown out of service, by the necessary reduction of the corps, until they could be reinstated by new levies; not such, as became so in consequence of a great victory, changing the whole face of affairs, and, in fact, putting an end to the war, as the capture of York did; after which new levies were not desirable, but the reverse.
What is meant by service to the end of the war ? In the case of privates, it is often said, if you serve to the end of the war, unless sooner discharged. This form of expres *543 sion is also sometimes used as applicable to officers. Thus the resolution of congress of the 16th September 1776, gave a land bounty to the officers and soldiers who shall engage in the service, and continue therein to the close of the war, or until discharged by congress. Supposing this to be a contract between the state and her citizens, the law of contracts is, that if there is a precedent condition to be performed by the plaintiff to entitle him to his reward, and the defendant pleads that he has not performed it, it is a good replication to say, I was ready and offered to perform, but you prevented the performance. But it has been argued, that there was no contract, because there was no mutuality; the officer not being obliged to serve, but at liberty to resign : and that half pay was a mere gratuity, in which case, a man, to entitle himself to a gratuity, must shew strict performance, substantial performance not being enough. The doctrine on this last point is this: if A. owes B. 100 dollars, and B.. says to him, if you will pay me 90 dollars on or before a given day, I will release you from the debt, and A. pays him on that day, 89 dollars only, he cannot claim to be released : but suppose B. had dispensed with the payment of the one dollar for his own convenience, or obstructs the payment of it, or refuses to receive any more than the 89 dollars, although the party is ready and offers to pay the whole. But I deny that half pay was a gratuity. The government had failed to pay its officers, according to original stipulation. The paper money had depreciated, long before the act of 1779, to such a degree that it did not afford the officer the necessaries of life, so far from being a compensation for toil and peril. This is a matter of history, and is also proved by the legislation of the country. Something was due in justice, on this account, to those who had thus sustained loss. Besides, if something is not done to place them on a better footing in future, the veteran officer must retire, and new ones cannot be procured. Amongst other things, therefore, the offer of half pay was made, it was mainly intended, as all knew, to keep the veteran officer iu *544 the field. The case, then, stands thus : A. contracts to pay B. so much per day, to reap for him until the end of his harvest, and it is agreed or not, that B. may quit when he pleases; but, if he continues to the end, he is to receive five dollars extra. The evening of the last day arrives, when A. for his own convenience, tells B. he will excuse him from reaping the last handfull, and binding up the last sheaf; it is for my interest, says he, that you should now quit my service, and depart from the field, and B. does so quit: Has he served to the end of the harvest, within the true meaning of the contract, and is he, or is he not, entitled to the five dollars ? Such, it seems to me, is the true question between the state, and such of her officers, especially the navy, and the corps at York, who served as long as the state wished their services; with this difference, that, at the very time of these transactions, this ulteriour reward of half pay, was recognized and acknowledged to be just by the government, as well legislative as executive, as will hereafter be more fully seen.
But it has been said, (and this court, in their decisions hereafter noticed, puts it on that ground), that the war did not end until the proclamation of peace, and that this alone was the end of the war, as meant by the act of 1779. It is true, that between nations, and according to the laws of nations, as I understand, war ends at different times and places, according to notice &c., after which, acts of war are criminal. Thus, I presume, on the signature of the preliminary articles at Paris, and when that was made known in England and France, (as it must have been long before it was made known here) acts of war would have been as criminal there, as they would have been here, after the same event was made known here. All this is very well, between the belligerents and their respective subjects and citizens j but I am greatly mistaken, if it has any thing to do with the true construction of the contract between the state and her citizens, and the questions of law arising under it, as between those parties. Can it be supposed that the law intended to *545 reserve to the state the power, as soon as it was believed, from the course of events, that the war was substantially at an end, nay, after it was known to be so, and within a few days before it is proclaimed, to discharge the army, leave the officers without a command, and direct them to retire from the field, and then say to them you have not served to the end of the war ? Surely, this was not the understanding of either party to this contract. The fair, natural, equitable, and legal understanding of it, is, to the end, of the war, unless sooner discharged; discharged, not for your crime or fault, but because it is our interest to discharge you. We wish to save expence to the state, being now satisfied that your services are no longer wanted. Of this we are the proper judges, you have nothing to do with it, and cannot resist it, without a violation of law, discipline, and good order.
This principle will be shewn hereafter to be at the foundation of the claims of the supernumeraries, under the act of 1779 : at present, I am considering it in relation to those, and especially, the navy, whose services were dispensed with, as no longer wanted, and to save expence to the state. But the officers of the navy stand even on a higher ground, it seems to me, than this argument places them. They had been put under the ordeal, sifted and cleansed, before the act of 1781, above noticed, and those who remained, purged from the chaff, were recognized, as it were by name, in the act of 1781. It was supposed, that that arrangement was then extant; but it turned out that it had been lost or destroyed, during the invasions of Arnold or Philips in 1781: when the executive, therefore, came to carry that act into effect, as to the state line, in order to purge and purify it also, this loss was doubtless discovered ; and, in order that there should be a proper list to guide the auditors in issuing warrants to the navy also, it was ordered, that the two senior officers of the navy should unite with the field officers, in order to make out these lists. The officers of the navy did not attend, no doubt under the idea that the previous arrange *546 ment, expressly recognized in the act, rendered it unnecessary, and not knowing of the loss of that list. Afterwards, however, in May 1784, another board was formed,, consisting of two field officers, and of commodore Barron and captain Lilly, to perform this duty as to the navy. The executive surely would not have appointed them, had there been á doubt as to the justice of their claims to half pay. It was probably known, that Lilly was one. of the original six captains, who were fixed in command by the executive, on the former occasion. This, board did not go into an original scrutiny as to the officers of the navy, but reported a list, which they say, according to the best evidence they could procure, is agreeable to the arrangement of the officérs of the navy next preceding the fall session of assembly in 1781, and that the officers named in that list, have always behaved themselves in such a manner, as to be justly entitled. to all the emoluments given by law to the officers of the state navy; except one officer (lieutenant Gray) who, they say they are informed, has since (viz. in 1783) misbehaved &:c. Thus they not only furnish the substance of the original arrangement, but shew that no subsequent misconduct, except as above, had occurred to deprive the parties of their claim to half pay. It was, of course, certified to the auditors as their guide in issuing certificates for half pay; there being no doubt in the minds of the executive, at that ¿lay, but that they were entitled to half pay. On this list are, James Barron, Commodore—Richard Barron, captain, commissioned January 6. 1776—Thomas Lilly, captain, commissioned January 14. 1776—and others. In all, only one commodore, eleven captains, four of whom were then dead, and five lieutenants, of whom one (Gray) was dead, including, I presume, the marines and all.
But, if I am wrong in supposing that captain Lilly had served to the end of the war, within the true meaning of the act of 1779 ; and also wrong in the opinion, that he is to' be considered as entitled to half pay under the act of 1781, he being one of those officers in the list or arrange- *547 merit lately made, and provided for, as it were personally, and by name, in that act; then, he must at least be a supernurnerary officer of the navy; and if the supernumerary officer of the state line is entitled to half pay, he must be also.
It is alleged, that this question is closed and shut up by two decisions of this court, on the very point. It will be recollected, that in May 1783, the legislature directed the auditors to issue warrants for half pay to the officers, both of the stale line and of the navy, and make a return to the next legislature, that funds may be provided &c. At the December session of 1783, however, the legislature, no doubt finding that funds had not been provided, and that they had been unable by any means then in their power, to support the credit of the warrants they had already issued to the officers, for their pay and depreciation, as settled under the above act of 1781, and which had got almost to as low an ebb as paper money itself, and possibly wishing to see whether congress would not take on itself the pay of the state line as well as the continental line; the further-issue of certificates for half pay was suspended until the future order of the legislature. This suspension was revoked by the act of 1790, as to those serving to the end of the war only. After this, viz. in 1791, a great number of officers came forward and demanded warrants for half pay; some of these were supernumeraries before the order to consolidate the troops at York, after the surrender of that place; some of them had become so on that occasion, and many of them as late as February 1783, after their troops had been enlisted from them, as before stated, when the last reduction of the legion took place. These latter claimed as having served to the end of the war; as did others, who remained with Dabney until the proclamation of peace. It may be proper here to remark, that, when the last reduction was made by colonel Dabney in 1783, and this new arrangement was made known to the executive, the council advised the governour to write to colonel Dabney, directing that the *548 supernumerary officers retire on half pay; and this was much relied on by those who were thus discharged, under a special order of the executive, saying to them that they were to have half pay.
The auditor, on the applications above mentioned, however, refused to issue the warrants, and appeals were taken to the district court of Richmond. That court adjourned the questions arising, to the general court for its opinion ; which court decided, that, under the act of 1779, the officers both of the continental and state lines were entitled to half pay, unless they failed to serve to the end of the war, or, being supernumerary, refused again to enter into the service on a command to that effect ; and that the troops being disbanded in February 1783, and the preliminary articles of peace being signed before that time, the officers ought to be considered as having served to the end of the war. Judgments were accordingly entered up in the district court for the appellants; and appeals were taken, on behalf of the commonwealth, to this court. The opinion pronounced in this court, in May 1792, was to this effect (confining the opinion to the officers of the state line): that such of the officers, and only such of them, as actually served to the end of the war, unless restrained, by being prisoners on parol or otherwise, and such of them who, becoming supernumerary, again actually entered into service, and continued therein to the end of the war, are entitled to half pay for life, to commence from the determination of their command or service, when the same was duly signified to them by the governour, and their regiments disbanded in pursuance thereof, which, it appears, was on the 19th and 22d April 1783. This decision, being contrary to that of the general court, not only as to the claim of the supernumerary, but as to what is to be intended by the terms, end of the war; being contrary, in these respects, to the understanding of the contract by the officers both of the continental and state lines; to the understanding of congress, when it undertook the discharge of those obligations, originally commencing with the act of *549 1779, as to the continental line, and our state line, who had . . . . occasionally supplied our quota in the continental line ; believing that no such ingenious or disparaging distinction, between the state and continental lines, was ever contemplated by the act itself, or by any subsequent act 'of the government, but that the reverse was clearly manifested, both by the state government and congress, in all their acts and resolutions, during the war, and for sometime after its termination; that decision, I say, could not be expected to be, nor was it satisfactory. There was attached to each case a reservation, that the decision should not prejudice the party, in any future claim, on fuller proof. Under this reservation, a number of officers, belonging to Dabney's legion, being the corps consolidated at York as aforesaid, and who had been deranged and became supernumerary under the last arrangement of that corps, in February 1783, again applied for warrants. Their application was again rejected, and they appealed to chancellor Wythe. He decided, (as will be seen in bis volume of Reports, 62.) in the same way that the general court did in the cases above mentioned. An appeal was. taken from this decision to this court; when three judges, one of whom came into the court after the former decision, reversed the decree of the chancellor on these grounds : 1st, that there was no new ground of evidence, whereon to found a distinction between the cases ; and 2nd, that the former decision had correctly decided that the end of the war, within the meaning of the act of 1779, was the proclamation of peace by the governour of Virginia. On this point they say, that the bounty of half pay, given, by the act of 1779, to the officers of the state line, in the said act described, was an extra reward or bounty for their services to the end of the war, if they should serve so long &sc. This case was argued entirely on the ground, that these parties had served to the end of the war, on which ground alone they put their case. Chancellor. Wythe had also put it on the same ground, though he enters into an argument, (which strongly marks the ability of that *550 judge) to prove, that supernumeraries were entitled to half pay under the act of 1779. The decision of the general court, as to supernumeraries, being thus fortified by the able argument of chancellor Wythe, the officers, as may well be supposed, were still far from being satisfied with the result. Their next course was to present petitions, individually, to the legislature, though it was long before they mustered resolution to do this; finally, however, many of them prevailed in that way, and succeeded with that body; and, amongst them, every one of the claimants in this case, (except Quarles, who it does not appear ever applied) and many of the other applicants in the first case, have also succeeded, some of whom were supernumerary as early as 1780, and some became so on the first consolidation of the troops under colonel Dabney, after the capture of York; besides others, who were not parties to either of these controversies. Thus every species of supernumerary has been recognized, as having a just claim to half pay, by successive legislatures; which is an evidence, that these decisions of this court were not satisfactory to that body, or to the country; and are sufficient, at least, to remove any weight which may have been given to the act of 1790, as a legislative interpretation of the act of 1779.
I have further reasons also for inducing me to believe that we are at liberty to re-consider those decisions. We have now a compilation of our laws, and of the journals and resolutions of the legislature, which, as to the army, in many respects, operated as laws; and which give us a ready reference to all the lights, which can hence be thrown on this subject, and without which, I confess, 1 should have been in great darkness as to points, which a laborious investigation has cleared up to my satisfaction. Besides this, many important documents, lost or mislaid at the time those cases were before this court, have been discovered; some of them between the first and second arguments of this case, and some of them even since the last argument. Indeed, I have been forcibly struck with the circumstances and manner un *551 der which these documents have, from time to time, as it were by accident, been brought to light. They are all submitted to us as though they had been before the court below, and are thus made part of the record before us. I think those documents would, probably, have had an important bearing on the question, had they been before this court formerly. They have, certainly, explained things to me, without which I would have been intirely in the dark, as will, presently, be seen. One of them, the list of navy officers, which has been discovered since the last argument, I consider of very great consequence in this particular case, as the former part of this opinion will shew.
We have been also favoured by Mr. Call, with his manuscript report of the arguments of counsel, and two of the judges, in the last case. We there see on what grounds that case was put by the counsel on both sides, and what considerations weighed with the court; and 1 think it manifest from this report, that the case was misunderstood in an important matter, and which had great weight with at least one of the judges who delivered an opinion. It was an error, into which I myself was nearly falling, and from which I escaped, by the aid of one of the documents which has lately been discovered. This, by the way, is one strong proof to me, amongst others which have occurred since I have been in this court, of the importance to the public of Call’s manuscript reports ; calling for their publication, so as to complete the series of our decisions. I take this occasion to tender him my thanks, for the opportunity he has given me of seeing the report of this case. It seems to me probable, that the court, as well as the reporter, fell into an error in that case, in supposing we had no troops for stale defence, in the strict sense of the term, except mere temporary corps, such as were raised under the act of May 1779, (10 Hen. stat. at large, 18.) and the legions, raised under the act of March 1781; or, at least, that the officers then and formerly before the court, were officers of corps of this description, and so were never contemplated by the *552 act. of 1779. They were, probably, under the belief, that the officers of our regular state line, had been provided for by congress. This I am inclined to infer, from the circumstance, that the reporter, in speaking of the troops that had been raised for state defence, says, that, of this hind, a body was raised under the act of May 1779, (above referred to) and another under the act of March 1781, to raise two legions &c. These are the only acts, for raising troops for state defence, to which he refers. Now, the first of these acts provided for raising a body of volunteers merely, for a temporary purpose, during an invasion ; the latter is an act to raise two legions of horse and foot, for the defence of the state, to serve during the war, but not to take the field, or do duty, except in case of actual or threatened invasion, ' during which they are to continue in the field, if the executive shall think proper. They are to be exempt from militia duty, and all manner of drafts ; to be paid whilst in service, or under discipline, and half pay at all other times, during the existence of said legions; the commissioned officers, though, to receive pay, rations, and forage, only whilst in service Sic. This, also, was, as a mere temporary corps, little above the militia; and who, though they may have served under Dabney, of which, however, I see no evidence, never had the shadow of right to half pay for life; and not a man of them has ever claimed it, or ever can. Yet, strange to tell, chancellor Wythe says, that Christopher Roane and others, (who were complainants in that case) were officers of one of the legions, raised under the act of March 1781. Mr. Call, the reporter, also shews, that this court fell into the same mistake ; for, he says, that the appellees were officers in colonel Dabney's legion, raised under the act of 1781. The arguments of both bench and bar shew, that they were clearly under this impression. Brooke, the attorney general, insisted, that from the nature of the levy, these officers were at the disposal of the government, and could be retained or disbanded at pleasure; their pay was during the existence of the legions only. However great their merits, they were *553 not to be compared with those of the regular armies; great part of their time was to be spent at home, and their actual service occasional only. The officers were not entitled to the provisions of the act of 1779; for that act relates to troops on general establishment, without particular stipulation. Besides, their compensation is prescribed in precise words ; and only while in service. No fair construction, he says, can place such limited service, on a level with the general services or rewards of the veterans. He next contends, that if they could be brought within the act, they did not serve to the end of the war &c. On the side of the officers, it was insisted, that the discharge was not absolute, but in the nature of a furlough, they being liable to be called again into service, according to the original organization of the legion; which, from its commencement, was subject to partial duties. It was never necessary, that all should be called at once into service ; but the detail was in proportion to the exigency of the occasion &sc. They then argue the point, when the war ended &tc. within the meaning of the act of 1779. My object, at present, is merely to extract so much of the report, as to shew, that these parties were treated, considered, and their cases adjudged, as though they belonged to one of the legions, raised under the act of M.arch 1781; and, I think, so far, the description of them, on both sides, brings them precisely within the terms of that act. The argument of the attorney general, has no bearing on the permanent regular state line, if such an one existed, except impliedly to admit, that such a corps would fall within the act of 1779. Let us see in what light the judges looked upon them : judge Roane says : to put men, whose duties were occasional only, and who were often not employed for the public at all, upon the same footing with the veteran, whose services were constant, continually exposed to the hardships and dangers of war, would have violated every principle of propriety. He then contrasts the services of one with those of the other; for the one, he says, express remuneration, during life, is made; for the other, no such *554 provision is made, and they claim it by equitable construction only. But, what equity have they ? By the terms of their organization, they were subject to less duty Sic. Carrington, concurred. Judge Lyons, first, objects to the contract, if it is to be so considered, for want of mutuality; the officer not having stipulated to serve, and not being bound to do so; 2nd, that it was a gratuitous bounty, offered for services when performed, and not before; 3rd, that there was not actual service during the war, and that a man, to entitle himself to a gratuity, must shew strict performance Sic.
I confess, that when I compared this case with the act of March 1781, and considered, as I then did, the claimants as officers belonging to one of those legions, I was astonished to find that any doubt could have existed as to the propriety of that decision as applicable to such a corps. The return of the state legion, under colonel JDabney, as made out and returned by him, was before that court; but the return of the field officers of the state line was not: it had then been mislaid, and is one of the documents discovered (as by accident) since this case was first argued in this court. That return contains a report of the officers of the various corps for state defence, except the navy and Crockett's regiment, viz. the first and second state regiments, the artillery and garrison corps, the state cavalry, and the Illinois troops; and Dabney's legion was composed of the remnants of these (except the last) remaining after the capture of York. I found that these corps had been raised, many of them at an early day, and especially the first and second regiments, which were raised under the ordinance of convention of July 1775. That one of them, with pretty full ranks, had marched to the north, as early as 1777, to supply our quota in the continental line, until it could be recruited, and had returned in 1779, with not one-third of the original force. And that another of them, I think the artillery, of which Christopher Roane was a captain, met the enemy under Gates at Camden ; and retired afterwards, so much cut up as that there was not more than one captain's *555 command, which fell to him. And what was my surprise, when I came to compare Dabney's list of his legion, with that returned by the field officers, to find that, instead of his legion being one of the legions raised under the act of 1781, they were the very veteran officers, spoken of by the attorney general and judge Roane, as alone coming within the meaning of the act of 1779 !
The officers, of course, were not present at the argument in this court, so as to correct the error which their counsel, as well as the attorney general and court, fell into, in this respect, and which error has remained unknown to them, and uncorrected, until I have had an opportunity, in consequence of the recovery of these papers, now to correct it. Whatever the formal decision of this case, as entered of record, may be, therefore, it is impossible to read the argument, both of the attorney general and judge Roane, without applying them favourably to the officers of the regular state line. They could not have argued as they did, had they known that the appellees were veteran officers.
I have been thus minute in the statement of this case, because it is not in print; and because l not only wish to take from its weight all that ought not to weigh against these officers, but to transfer to the opposite scale whatever of it belongs to that side of the question.
But to proceed, as briefly as possible, to the consideration of the act of 1779. Suppose congress had never taken upon itself the pay of the continental line, and they, i. e. the supernumeraries of that line, were now looking to us for their half pay, under the act of 1779; could we say no to them ? Could we have amended the act, during the war, so as to make it mean, that the supernumerary officer, never called on to re-enter the service, should not be entitled to half pay ? No one will pretend to deny, but that such an act of the legislature, at that time, would have disbanded the army. Why ? Because no officer knew when he would become supernumerary; and it was the full understanding of all parties, that, however this may happen, it shall not *556 prejudice you, if you hold yourself ready, and re-enter, as many did, when called on. But congress have since agreed to redeem this pledge, and to pay the supernumeraries of the continental line; having recognized their right as originating under this act of 1779,'and to which they would have been entitled, as all admit, had congress permitted it to remain entirely on this act. But the words in this, and all the other acts, where the two lines are provided for in' the same law, are precisely the same, as to each, in all important particulars; and in the section now under consideration, are precisely the same. They must, of course, have the same interpretation, as to both. Had any discrimination or difference been attempted, by law, during the war, a dissolution of the state line, and total destruction to our cause, would have been the result. But if there was then no doubt about it, that was the time to explain it: on the contrary, the right was then- admitted, in the clearest and most explicit terms by every branch of the government; committees, with Patrick Henry at their head, reporting resolutions and laws, full to the point; and the executive, aided by Edmund Randolph, the attorney general, as their law adviser, admitting that the construction of the officers was the correct one. In addition' to all which, in my humble opinion, the act itself will admit of no other sensible construction.
Strike from the act the clause respecting supernumeraries, and then it will be, simply, a promise of half pay for life to the officers who serve to the end of the war; similar to the resolution of congress of May 1778, giving half pay for seven years to the officers of the congress troops, who serve to the end of the war. If this were all, the officer who has fought his battle and lost his men, or if their time of service is out, and he is without a command, has done no wrong; he cannot be cashiered for this; he remains in camp until his corps is replaced, or until he gets a furlough: you cannot dismiss him, especially if his ulteriour emoluments, in land or half pay &c. depend on his service to the end of the *557 war (and the supernumerary has as regularly got his land, as any other). But it was necessary to promise half pay, in order to keep our armies in the field: but the government 1 f wants it so arranged, that the officers, when without command in the field, may be directed to retire, without forfeiting their land bounty, or half pay, as It were under a law furlough, if I may use the expression. This is an arrangement beneficial to the state, inasmuch as it. saves pay and subsistence, and, at the same time, enables the state to recall the officer, if wanted. This is the true history of the case, according to my understanding of the act, and the motives which gave rise to it; and it was so understood by the officers, and was acted under by them; and this construction was recognized, both before and since the war, by the legislative and executive branches. This construction, too, alone, in my opinion, gives sense to those words in the act, “ to commence from the determination of their command or service,” or to the words, “ from the time of their reduction,” in the resolution of congress of October 1780, which declares, that the officers, who shall continue iu service to the end of the war, shall be entitled to half pay for life, to commence from the time of their reduction, not from the end of the war. Indeed, if half pay depended on actual service in the field to the end of the war, in any sense of those terms? why say any thing about supernumeraries ? If, so soon as they became such, they wore to have no more claim than any one else who might thereafter enter the service, and continue therein, why say any thing further, than that the government reserves a right to discharge them, and deprive them of this ulteriour reward ? This would not have prevented their again entering the service, and finally obtaining their reward. We well know, that such a provision would have disbanded the army. Had it been left, as congress at first put it, as to their troops, on service to the end of the war, then a discharge before that, must either have produced the effect that I before stated, that the officer being thus prevented from serving without his fault, was entitled to the *558 reward; or he would have a right to remain in the field, or on furlough, until wanted, and get full pay &lc.
I have looked into the journals of the day, when the act was passed for adjusting the pay of the army, and directing discriminations to be made, to see if any doubt was then entertained on this subject; but so far from this, I find the reverse was the case. Reduced officers, then entitled to half pay, were recognized as belonging to both lines: but as many officers in the state service may never have been in the field; may have been mere recruiting officers &c.; may never have enlisted their men so as to take the field; or for many other causes, could not have been within the true meaning of the act; it was but justice to the state that all such should be excluded. The executive so understood it; and they certified the list to the auditors for their guide in issuing warrants: not warrants for service to the end of the war, for it had not been ended; and, until it was ended, no one could claim on that score. Nor was it for them to hold up the list of supernumeraries, to see who would reenter, and serve to the end of the war; for there was surely no necessity for it on that score; if he was then found in service, it could not have been objected that he had been a supernumerary for a time. On the construction contended for by the commonwealth, the whole clause is senseless and useless.
Justice to myself, and to the country, has compelled me to give, thus minutely and at large, my views on the subject, this question being one not less important to the character than to the treasury of the state. I believe the supernumerary officers have law and justice on their'side; and, so believing, I cannot refuse to say, both in my character of a judge of this court, and of an individual who will have to pay my proportion, that justice ought to be done to them.
I am, therefore, for affirming the judgment.
Brooke, P.
The great difficulty in deciding these cases, is to keep within the line of judicial duty. If we pass that *559 line, and estimate the claims of the officers of the army of the revolution by their peril and their blood, we enter a field which ought to be explored by the legislature and not by the courts. The obligations of national gratitude for services generally very great, and, in particular instances, almost without example, can only be weighed by the representatives of the nation. The claim, therefore, before us must be decided on the legal obligations of the government, as in other cases, and not on the obligations of national gratitude. This is not the first case in which, while the feelings of the court revolted against its duty, yet, it was so firmly bound by that duly, that it was compelled to pronounce a decision which has been scandalized as unfeeling and unjust. It is impossible to read the opinions delivered in the case of the Commonwealth v. Roane and others, without sympathizing with the judges who pronounced those opinions; and well may it be feared, that the opinion now to be delivered will not be better treated; however that may be, I ought not to turn to the right or the left to inquire.
I think it impossible, on the testimony before us, to come to the conclusion, that captain Lilly continued in service to the end of the war, that is, to the proclamation of peace by the governour of the state. I entirely concur with judge Green, in the view he has taken of it; his claim to a land bounty for three years service only, by captain Lilly himself, which he received, negatives the proposition that he served to the end of the war. It would be impossible to account for his claiming a land bounty for three years service only, which did not entitle him to half pay for life; when, if he had served to the end of the war, he would have been entitled to both; nor could he be entitled to a land bounty for three years service only, and also claim for service during the war, upon any sound construction of the acts of the legislature on that subject. He must be presumed to have understood his own claim, much better; especially when his name is found in a list of a board of officers appointed to ascertain the claims of others. The testimony of commo *560 dore Barron, also the most competent witness, who knew him intimately well, and who was in the same service, negatives the proposition, by proving nothing that tends to support it. The declarations of the other witnesses that they understood and believed, that captain Lilly served to the end of the war, though entitled to great credit for their veracity, are entitled to little weight, when it is considered, that none of them profess to have any precise knowledge of the facts they speak of. ' Believing, then, that it is not proved, by any of the foregoing testimony, that captain Lilly served to the end of the war, what is the evidence of that proposition to be extracted from the report of the board of officers, lately found and brought into the record ? That board, it appears, was constituted, not for the purpose of ascertaining who were entitled to half pay under existing laws, but who had forfeited their claim by misconduct or other causes; and all that can he extracted from the report, is, that captain Lilly had not forfeited his existing rights. That this was the character of the board, is clearly inferrible from the circumstance, that some of the officers of the state troops are reported to have lost their claim, though they had served to the end of the war. If I am correct in this, captain Lilly’s pretensions are not strengthened by any thing in the report, and his claim must still rest on the other evidence, and on the provisions of the law; and putting it on the most favourable ground, and considering him as a supernumerary officer, the inquiry is, whether it can he brought within the act of 1779, and the subsequent acts on that subject?
On a fair construction of that act itself, it would be impossible to bring the officers of the navy within its provisions : they are not in terms included in it. The officers of the navy were commissioned to command particular vessels, and though there was an organized navy board and staff, yet no officer could he accurately said to be an officer of the navy of Virginia, in the sense that would he applicable to a more permanent navy, such as that of the United States. *561 Their service was more transient and fluctuating, than the service of the state troops, and that may account for their not being named or included in the act of 1779. But I think it is very clear, that the legislature considered them as included by the acts of November 1781, and May 1783. The act of November 1781, § 12. enacts that, the officers and seamen of the navy of this state, as they stand arranged by a late regulation, shall be entitled to the same advantages as the officers belonging to this state in the land service, agreeably to their respective ranks. Whether the advantages here mentioned, included half pay for life, is, at least, doubtful; but by the act of May 1783, this doubt was then removed. It enacts and directs, that the auditors shall yearly issue to such of the officers of the state line and navy as are by law entitled to half pay for life, their warrants for the same, and make a return &c. This act, though it provides for such officers of the navy as were entitled to half pay, does not specify who they were, nor directly affirm that they were entitled; but leaves that to be settled by the auditors or the courts.
No inference can be drawn, from the circumstance, that warrants were to be issued, and the return made to the next session of the legislature, that supernumerary officers who had not served to the end of the war, were entitled to half pay; because, half pay was due to some who did serve to the end of the war, having been supernumeraries, and again having returned to service, according to the terms of the act of 1779. However that may be, it is very clear, that the legislature meant to leave that inquiry to the auditors and the courts. This is made more manifest by the doubt, which appears to have existed at the time, whether the supernumerary officers who had never been required, and never returned to service, were entitled to half pay. On the 11 th of December following, we find that the attorney general gave his opinion to the auditors, that the supernumerary officers were entitled to half pay; in consequence of which, it can be hardly doubted, the legislature, on the 22d of the *562 same month, December 1783, passed the resolution directing the auditors to issue no more warrants to the officers of the state line. Why the officers of the navy were not included in that resolution, it is difficult to decide. As they were not included in terms in the act of 1779, probably for the reason before stated, and very doubtfully provided for, as to half pay, by the act of November 1781; and as by the act of May 1783, though included in terms, their right to half pay was not affirmatively settled, but left to the auditors, to he ascertained by the pre-existing acts; the legislature, by not including them in the resolution of December 22d 1783, left it as an open question, whether they were or were not entitled to half pay. And thus the matter stood until the act of 1790; which, though it professes to explain the act of 1779, in relation to the officers of the state line, uses, as to them, the same language that is found in the latter act, disregarding intirely the officers of the navy. Was this because, by that time, the legislature had come to the conclusion, that, though they had been named in the act of 1783, their claim was to be ascertained by the auditors or the courts, and that, in truth, not being provided for in the act of 1779, they had no claims ? or was it, because, as was the fact, that not more than one vessel, at most, was in the service at the end of the war, and, perhaps, not that one precisely at the proclamation of peace by the governour of the state ? However that may be, it is certainly a remarkable circumstance, that the officers of the navy were omitted in the act of 1790, enacted to explain the act of 1779.
But, waiving the exposition of the act of 1790, and supposing that ^captain Lilly’s claim stands on as high ground as that of the supernumerary officers of the state line, in the case of the Commonwealth v. Roane &c. it must, on the authority of that case, and on principle, have the same fate. No officer of the state line or navy held their commissions to serve during the war: there was no binding obligation on them to continue in service during the war: they were, at all times, at liberty to resign their commissions, *563 except when under special orders to perform some duty : nor was there, in the nature of things, any obligation, on the part of the government, to keep them in service longer than the exigencies of war required ; it had a right to disband them at will. The act of 1779, then, did not put them on the footing of officers of the state line in continental service. These wore commissioned by congress, and, when supernumerary, liable to be called into service at any moment, without the power of refusal when called, though they also might resign, when not under special orders to perform some duty. The offer, then, of the act of 1779, to the supernumerary officers of the state line, who, when called into service, should not refuse to return, and who should then continue in service to the end of the war, was of an intirely different character from the offer by congress, of half pay for life, to the officers of the continental line, who should remain in service to the end of the war, or, coming into service after the resolution of 1780, should remain in service to the same period. On the one hand, from the moment that the officers of the state troops were put out of actual service by the reduction of their corps, with the right to refuse to come into service again when called, they were completely disbanded, and were as if they had never been in service, as to any obligation on them for future service. On the other hand, the officers of the continental line were never disbanded: though supernumerary, for want of command, they were virtually in service, and so continued until the end of the war. The court, therefore, in the case alluded to, was not bound to consider how congress had treated its officers, in regard to half pay. The act of 1779, and the succeeding acts, were its guides to the conclusion to which it came; in these, it found no obligation on the part of the government, but a mere offer, depending on a state of things, which never had occurred in the case before it. The chancellor, whose decree it reversed, gave a different construction to the act of 1779. He disregarded the distinction between those supernumerary officers, who came *564 again into service, and' served to the end of the war, and those who never returned to service : he was perplexed by the words, “ command or service,” in the act. By referring the word “ service,” to officers of tire staff, who never command in that character, though they do service, and the word “command,” to- officers who do command, and,do service also, reddendo singula singulis, he would have perceived, that the act of 1779, required actual service to the end of the war, to entitle an officer to half pay for life; and did not include those officers, who, being supernumerary and out of service, and who had not refused to return, not having been required. This court construed the act of 1779, according to the obligations of the parties, at the time it passed; not the supposed obligations for a glorious peace and independence.
The government, when it could not recruit men to fill up the ranks, was under no obligation to retain the supernumerary officers on pay and rations; it had a right to disband them, and it did so, in effect, when, by the act of 1779, they had a right to refuse to again enter the service : these words, again enter into service &ic. imply disbandment; for, when an officer has a right to refuse to do duty, by the license of the government, he is disbanded. It would not have been esteemed patriotic in the officer, to remain at home, and retain his rank, exempt from militia duty; and, though never again in service, to claim a compensation like that given to the officers, who, if supernumerary, had returned to service, and continued to the end of the war, or who had remained in service from the date of their commissions, to the same period. Those words “ if required, shall again enter into service,” imposed no binding obligation on either party: they contained the nature of the condition on which half pay was to be given : they impute no fault to either party, who might not act. Under them, the government was not bound to require the service of officers, when it had not men; nor was the officer bound to comply, if required again to enter into service.
*565 This court gave this construction to the act more than . thirty years ago, which has been acquiesced in by the officers and their representatives; if it is now to be disturbed, I presume we shall hear no more of the rule stare decisis. It considered the claims of the officers, in the case before it, with great precision; it was bound to do so by its judicial duty. Was it founded on contract, or a mere promise of a bounty for future service, depending on the requirement of the government itself? In either aspect, as there was no binding obligation on the officer to the government, he was held to prove exact performance of the condition prescribed by the acts under which he claimed : virtual performance was not enough, in such case, however strong was the claim on the gratitude of the country, which was fully admitted; and though, in that case, the claimants were in service to the signing of the preliminary articles of peace, that was not proof of exact performance of the condition, prescribed by the act of 1779. It was not, in contemplation of law, service to the end of the war. They had retired from service, before the proclamation of peace by the governour of the state. The government, to which the public force belongs, has the sole right, as respects it, to decide when the war-ends and peace begins. Though the proclamation of peace did not make the peace, it revived the obligations of peace, and put an end to the obligations of war. In this respect, though it did not make peace, it put an end to the war, and thereby fixed the term of service required by the act of 1779, to entitle the claimants to half pay for life. If I am right in the opinion, that captain Lilly did not serve to the end of the war, though his claim is placed on as high ground as that of the supernumerary officers of the state line, it should be rejected, and the judgment of the superiour court of Henrico reversed.
By the majority of the court, judgment affirmed.

 Original form of the bill of May 1779.
“ All general officers of the line in the continental army, being citizens of this commonwealth, and all field officers, captains, and subalterns commanding the troops of this commonwealth on continental establishment, and accounted a part of the quota of this commonwealth, who shall serve henceforward, or from the time of their being commissioned until the end of the war, shall be entitled to half pay during life, to commence from the determination of their command.”
1. Amended by striking out “ line in the continental,” by inserting “ in,” after “ commanding," and inserting “ battalions” in lieu of “troops.”
2. By striking out “ and accounted a part of the quota of this commonwealth,” and inserting in lieu thereof “ or serving in the battalions raised, for the immediate defence of- this state,” and by adding afterwards, and after “ defence of this state,” the words “ or for the defence of the United States, being citizens of this commonwealth, and not being in the service of Georgia or of any other state: provided congress do not make some tantamount provision for them.”
3. And by inserting after ■“ end of the tear,” the words “ and all such officers as have or shall become supernumerary on the reduction of any of the said battalions, and shall again enter into the said service, whenever required so to do, in the same or any higher rank, and continue therein until the end of the war.”
Amendments-in the senate.
1. By striking out in the last amendment above mentioned, “ whenever,” and inserting in lieu thereof, “ if.”
2. By inserting after the word in the original bill “ commanding,” the words, “ or shall command.”
The other amendments cannot be traced; but those above noticed fortify the construction in favour of supernumeraries not again called into service.