Nott, J.,
delivered the opinion of the court:
The court has listened to the two arguments of the counsel for the claimant with the respect which their learning, ability, and earnestness demanded, and has approached the consideration of this case with the favorable inclination that a revolu- *521 nonary claim always receives in this country; but has regretfully reached the conclusion that the moral probabilities on which it rests do not constitute such a foundation of eirrmmstantial evidence as would sustain a verdict in a suit at nisi -prius or authorize a judgment in this court. A brief analysis of the jase will, we thinli, render this apparent.
But, at the outset of this inquiry, it is to be noted that there ire certain terms in the legislation of the Continental Congress, and in the military dispatches and orders of the time, of which the significance should be ascertained.
In the recent war, the official process by which officers, sol-liers, and regiments of volunteers were" discharged from the service of the United States was termed their “ muster out.’” The certificate given to a soldier evidencing this fact was termed his “discharge.” The combination of different regiments or fragments of regiments into new regimental organizations was called their “ consolidation,” and the officers thrown Dut by consolidation were spoken of generally as “officers unattached,” i. e., as officers holding commissions and still in the-service, but as not attached to any command. (Hildeburn’s Case, 13 C. Cls. R., 62.)
During the period of the Revolution the term muster-out was not used, and troops, either individually or as organizations,, are spoken of as “discharged” when dismissed from the Continental service. A regiment broken up and consolidated is spoken of as “reduced,” and officers who were thereby thrown out and became unattached were designated as “supernumeraries.” The consolidated regiments, moreover, are variously designated as “the new arrangement,” the “new establishment,” the “newly constructed corps,” &c. As to the term “ disbanded,” it seems to have had no technical significance-When a regiment was disbanded, some of its soldiers may have-been discharged and some transferred to other regiments, the-term denoting simply the dissolution of the regiment.
The undisputed facts of the case are these:
In December, 1778, Maj. Francis Taylor was one of the supernumerary officers who had been thrown out by that consolidation of regiments in 1778, which is best known as the White Plains arrangement. As such.supernumerary he was liable to be called into service on the one hand, and entitled to half-pay for life on the other. At that time the captured army of Gen *522 eral Burgoyne, popularly and officially designated as tire “coi vention prisoners,” had been conducted to Albemarle by troop ■of the Virginia line; that is to say, by a portion of the regula army able and liable to do active field service. But the tas of guarding them had been assigned to the State of Virginii At that time, as in all wars, it was found that there were man persons willing to enlist for guard or provost-marshal dut who were unwilling to encounter the privations, hardships, an dangers of active service in the field. Accordingly, it was sag gested by Mr. Jefferson that a regiment be raised for the ei press purpose of guarding the convention prisoners.
On the 19th December, 1778, the house of delegates passei the following resolution authorizing and directing the raisin; of such a regiment:
“ Whereas it will be exceedingly burthensome and inconveni ent to the inhabitants of this commonwealth to keep) so larg a body of militia on constant duty as will be necessary to guar< the British prisoners which now are or hereafter may be sta tioned in this commonwealth:
“Resolved, That the governor, with the advice of the counci' .shall be, and he is hereby, empowered to raise, as soon as pos sible, by voluntary enlistment, a regiment of soldiers, to consis of six hundred men, rank and file, with proper officers to com mand them, for the particular purpose of guarding the Britisl prisoners aforesaid; and that he is empowered to offer a bount; not exceeding thirty dollars to each man so to be enlisted; am this house will make good the expense of raising, maintaining -clothing, and piaying the said regiment; and until such regi ment be raised, the governor is hereby empowered, with th advice of the council, to call out detachments of militia for th purpose of guarding the said prisoners.” (Jour. House Dele gates, 127.)
And on the 9th January following (1779) the Continenta 'Congress, probably in pursuance of some private understanding with the authorities in Virginia, passed the following resolu tion:
“Saturday, January 9,1779.

*******

“A letter of the 6th from the Board of War was read; where upon
“Resolved, That a battalion consisting of 600 men, properly •officered, be forthwith raised on Continental establishment ii Virginia, for the space of one year from the time of their enlist ment, unless sooner discharged, under the direction of the gov •ernor and council of that State, who are hereby empowered ft! *523 ■ppoint the officers of the said battalion out of those of the Virginia ine, who have been left out of the late arrangement of the Gontinenal Army, as far as their numbers, will reach.
“Tlie regiment to consist of one lieutenant-colonel commandant, and captain, one major and captain, six captains, one cap-ain-lieutenant, seven lieutenants, nine ensigns, one surgeon, me surgeon’s mate, eight companies of 75 men each, including ¡orporals, three sergeants, one drum and one fife to each com->any.
“That these troops be stationed at and not-removed (except o such distances as the duty of the post may' require) from the >arracks in Albemarle County, as guards over the convention scoops; that they' receive the usual pay of the Continental Army', and a suit of clothes as a bounty to each non-commissioned officer and private.
“That as soon as the said regiment shall be so far complete as o be able to do the duty of the post, the militia now in the sero-ee there be discharged.” (3 Jour. Cong., 179.)
Under these resolutions such a regiment was raised, and Maj. francis Taylor was assigned to the command of it, with the ■ank of lieutenant-colonel. Thereafter it was known as the Albemarle Guards, and is occasionally spoken of simply as the ‘ Guards.”
On the 5th March, 1779, Lieutenant-Colonel Taylor was com-nissioned as colonel of the regiment by the governor of Virginia. Under what authority or upon what theory' this was lone nowhere appears inofficial or historic records. We know rom the Journals of Congress that there was no express or specific authority given for thus transcending the limit of rank ixpressly set by the resolution 9th January, 1779, but the fact hat he was thus commissioned is unquestioned and forms a significant element in the claimant’s theory of the case.
On the 9th January, 1780, the regiment was still iu service, guarding the convention prisoners, and continued so to serve :or nearly three times the period of their original enlistment. Whether the men re-enlisted is unknown, and by what authority :he regiment thus continued upon Continental establishment ¡annot be ascertained. The Journals of Congress are again silent, and no order or correspondence which would throw light upon the subject appears to exist; but it is unquestionable hat the same regiment so commanded by Colonel Taylor continued thus in service until, under an order issued by the governor of Virginia, the convention’s prisoners being removed into *524 Maryland, tbe regiment was disbanded on loth June, 178: This order of Governor Jefferson was as follows’:
“ In Council, March 14,1781.
“ Col. F. Taylor :
“ Sir : Before this comes to hand, Col. Wood will have r< ceived orders to carry the conventioners to Knowland’s Ferrj thence to be guarded by the State of Maryland.
“At that place, therefore, you will please to discharge such c your regiment as were enlisted to serve only during the coi tinuance of the conventioners in Albemarle or in this State.
#¿í, .U. «tí* VP Vt* VP, VP VT VP
In order to understand the significance of these facts an their relations to the present case, it is now necessary to advei to the law upon which the claim of Colonel Taylor and his de scendauts rests.
The Continental Congress, by the Resolutions 3d October an 21st October, 1780 (3 Jour. Cong., 532, 538), determined t reorganize the Army in a manner which would involve the coi solidation or reduction of regiments. The Army, which was t be reduced as designated by the resolutions, then consisted c sixteen “additional regiments,” some or all of which had no been “annexed to the line” of any “particular State,” of cei tain specifically-named irregular battalions and light corps and of eighty battalions, known as the Continental line. As t the “sixteenadditional battalions” and the irregular battalion specifically named, the resolutions directed that they “be re duced ” and the non-commissioned officers and privates “ be in corporated with the troops of their respective States.” Thi provision related to troops which had been raised directly b; Congress, and its purpose was threefold — to sweep them out o existence as organizations, to transfer the men to the regula regiments of the Continental line, and to credit them to th quotas of their respective States.
The resolutions next provided for the further reorganizatioi of the Army at large — of the Continental line. So far as thii case is concerned, it is sufficient to say that they provided ii effect that the eleven regiments in the line furnished by Yir ginia should be reduced to eight and that no mention of tin Albemarle Guards is made in the resolutions.
Having thus provided for the transfer of men and'reductioi of regiments, the resolutions further declared with regard t< *525 ie officers wbo would necessarily be thrown out by the reduc-on:
“ And whereas, by the foregoing arrangement, -many deserv-lg officers must become supernumeraries, and it is proper that egard be had to them :
“Resolved, That from the time the reform of the Army takes lace they be entitled to half-pay for seven years, in specie or ther current money equivalent, and also grants of land at the lose of the war, agreeably to the resolution of the 16th of Sep-ember, 1776.
“ Ordered, That a copy of the foregoing arrangement of the krmy be sent to the commander-in-chief for his opinion thereon, .nd that if there shall appear no material objections, the same be arried into immediate effect. (Resolution October 3, 1780.)
“ Congress resumed the consideration of the report of the ommittee on General Washington’s letter of the 11th •, and-hereupon * * *
“Resolved, That the whole of the troops be enlisted during he war, and join their respective corps by the 1st day of Janu-ry next.
“That the commander-in-chief and commanding officer in he Southern department direct the officers of each State to reet and agree upon the Officers for the regiments to be raised >y their respective States from those who incline to continue n the service; and where it cannot be done by agreement, to >e determined by seniority, and make return of those who are o remain, which is to be transmitted to Congress, together pith the names of the officers reduced who are to be allowed Lalf-pay for life.” (Resolution October 21, 1780.)
It is manifest that Colonel Taylor’s regiment, or the Albe--uarle Guards, were not designated by the resolutions in direct erms, nor do they seem to have been embraced in any general lassiflcatiou. The regiment had been raised for the space of me year from the time of enlistment unless sooner discharged, t was to be “ stationed at and not remorded (except to such Listance as the duty of the post may require) from the barracks n Albemarle”; and its sole military service was that it should ict “ as guards over the convention troops.” If it continued ipon this basis until discharged, it is clear that its officers did lot become supernumeraries under the arrangement for reorganizing the Continental Army of October 3 and 21, 1780 (3 Four. Cong., 532, 538); for, in the first place, the regiment vould have passed out of existence before that time arrived ; md in the second place, it had, as originally constituted, no naterial to be consolidated; that is to say, no enlisted soldiers *526 wbo could be transferred to tbe regiments of tbe line. Its sol diers bad been enlisted not only for a limited period, but also for a limited designated service, and that service was to be rendered within exceedingly narrow territorial limits. Tbe ques tion therefore is whether the Albemarle Guards, or a portion o: them, had re-enlisted for tbe war under the contemporaneous Resolution 23d January, 1779 (3 Jour. Cong., 190), and became reduced or consolidated with other regiments under the resolu tions.of October, 1780.
The learned counsel for tbe claimant contends with great earnestness that the evidence produced and the history of the period combine to sustain the conclusion that they did re-enlist, and this for the following reasons:
In the first 'place, it is argued, before the regiment could have been fairly organized the Continental Congress, on the 23d of January, 1779, resolved “ that the commander-in-cbiei be authorized and directed to take the most effectual measures to re-enlist for the continuance of the war all such of tbe Continental troops as are not expressly engaged for that period. “And the resolution moreover declared and promised new bounties and new rewards to each able-bodied soldier now in the service andjwho shall voluntarily re-enlist during the war.”
On tiro 9th March, 1779, Congress amended tbe resolution and recommended that the States raise troops by draft. (3 Jour. Cong., 223.) In May of the same year came the Virginia re-enlistment act (10 Henning’s Stat., 25), and on the 16th August following Congress recommended to tbe several States to make further provision for the soldiers “ enlisted for the war”; and on the 15th December, 1779, shortly before tbe time when tbe year of tbe original enlistment of tbe Albemarle Guards -would expire, Congress further resolved “ That such of tbe Virginia troops whose times of service will expire by tbe last day of March next, and who incline to eidist for the usual bounties to serve during the war, be permitted to go home on furlough till tbe first day of April next.” (3 Jour. Cong., 412.) It therefore happened that through this prescribed year of the Albemarle Guards’original enlistment the strongest and most strenuous efforts were made to procure re-enlistments for the war that the history of the Revolution discloses. It would be contrary to reason and experience, it is said, to suppose that tbe combined efforts of the'Continental Congress, tbe com- *527 amler-in-cliief, and the State of Yirginia produced no effect hatever on this one Yirginia regiment.
In the second place, the resolution 9th January, 1779, authoriz-Lg the Albemarle Guards, provided that the battalion should 3 commanded by a lieutenant-colonel. On the 5th March fob wing, the commanding officer was commissioned as colonel.
: the regiment had continued upon its original basis it would ave required fresh legislation to authorize the promotion. We now from the Journals of the Continental Congress that no ich legislation took place. Between the 9th January and the-bli March, on the contrary, came the resolution of 23d January, 779 (3 Jour. Cong., 190), showing no favor to short enlist-íents, and making the most strenuous effort to procure re-en-stinents for the war. When that resolution was passed, Colonel 'aylor’s men had a year of service before them; the resolution romised them liberal if not exorbitant bounties to change this-hlistment into an enlistment for the war; and the only known splanation of his becoming a colonel on the 5th March, con-?ary to the terms of the resolution under which he came into íe service, is the natural probability that a considerable numer of his newly-enlisted men accepted those bounties and ielded to the solicitations of their officers by re-enlisting, hereby becoming ultimately a part of the Continental line.
In the third place, the resolution 9th January prescribed a ieriod of service not exceeding one year for the regiment. To-xtend this period of service, if the regiment continued to stand >n its original enlistment, would require new legislation. No uch legislative authority was given. We also know by the .istory of the war that when a regiment’s time had expired the-len were generally clamorous to return to their homes. Yet his regiment continued in service without legislative authority n the one side and without applications for discharge on the ther from the 9th January, 1779, to the loth June, 1781, that 3 to say, for a period more than double that of its original en-Lstment. The only explanation of this unprecedented fact he learned counsel contends is that the men had re-enlisted or the war.
In. the fourth place, after the original year had elapsed, Congress in the Resolution 9th February, 1780 (3 Jour. Cong., 432), recognized the Guards as a part of the Yirginia quota' of the lontinental line and classified them among men “ whose times *528 of service do not expire before tbe last date of September next.’1 When we remember the close scrutiny which the Continental Congress gave to all matters connected with the Army of the Revolution, and the intimate knowledge of details which the journals constantly display, we must regard this recognition oí the Guards, it is argued, as almost conclusive evidence of there having been a re-enlistment.
In the fifth place, more than two years after the original enlistment of the regiment and more than a year after the original term of service had expired, Colonel Taylor apparently had applied to the governor of Virginia to promote some of his officers. At that time the reorganization of the Continental Army under the resolutions of October, 1780, was going on, and the inspector-general, the Baron Steuben, had been sent to Virginia charged with the duty of consolidating the regiments of that State. Accordingly Mr. Jefferson, then governor of Virginia, replied to Colonel Taylor:
u Richmond, Feb. 13,1781.
“ Col. F. Taylor :
“ Sir : * * # Congress having determined newly to model their forces, the Baron Steuben is now here on that business.
“ The assembly have directed the executive to have the same done as to the State troops.
“ Your regiment, being in Continental service, will be submitted to Baron Steuben; till this be done, which, however, will be done in a few days, no promotions can take place.” * * *
In the sixth place, the last order known to have been given to Colonel Taylor is that of Governor Jefferson, 14th March, 1781, directing him to carry the convention prisoners to Know-land’s Ferry and turn them over to Colonel Wood. Mr. Jefferson does not then notify him that he, his officers and regiment, will be discharged from service, the duty for which they enlisted having expired, but on the contrary he directs him “to discharge such of your regiment as were enlisted to serve only during the continuance of the conventioners in Albemarle or in this State.” The order, the learned counsel contends, is so directly opposed to the entire dissolution of this regiment in conformity with the provisions of the original resolution 9th January, 1779, that it can only be reconciled with that resolution by the supposition that the’ greater part of the men had re-enlisted for the war.
Finally, and in harmony with and corroboration of the fore- *529 ;oing circumstances, Colonel Taylor, immediately after the war, rMle tlie facts were fresb in tlie minds of men and tlie docu-lentary evidence to substantiate tliem was still extant, was ■aid bis depreciation pay for the period that he served as colonel f the Albemarle Guards, although the resolution 10th April, 780, authorizing such pay, expressly provided that “ no person hall have any benefit of this resolution except such as were ngaged to serve during the war or for three years.”
Notwithstanding the ability and plausibility of this argument, ■ e are constrained to say that the circumstances and eoinciden-es so much relied 1131011, though they might appeal strongly as stablishing a moral probability to a body possessed of legislaive discretion, do not rise to the standard of legal evidence and re insufficient to authorize a judgment or sustain a verdict. To authenticated document nor official record has been produced 1 show that a single soldier of Colonel Taylor’s regiment had 3-enlisted for the war, or was liable to serve beyond the limits f the State of Virginia, or could have been transferred to regi-ients of the line under the resolutions. No such averment ras made by Colonel Taylor himself in his petitions to Congress nd the house of delegates, nor is it alluded to in any contem-orary report, letter, or communication. Neither the house of elegates, in 1783, nor the Secretary of War, General Knox, in 791, regarded the Albemarle Guards as one of the regiments hich had been reduced and consolidated under the resolutions f 1780; and the silence of the resolutions themselves, with all xeir particularity as to other commands, indicates that the ontinental Congress were not aware of there being soldiers in íe Guards who were liable to be transferred to the line.
Moreover, the time when the regiment was disbanded, June 5, 1781, was subsequent to the consolidation of the Virginia igiments by the Baron Steuben (February), and the apparent tuse of disbandment was not its consolidation with other regi-ents, but the termination of the service or duty for which it id been raised and on which it had been exclusively engaged, he mention of the Guards in the Resolutions dth February, 780 (3 Jour. Ooug., 432), and in the correspondence of Mr. Jef-rson with General Washington, on which great stress was laid . the argument, was applicable to the regiment, whether its ildiers had' re-enlisted or not; for it was proper and just that 3 soldiers, who were continuing in service beyond the period *530 of their enlistment, and who, in all seeming likelihood, were 1 continue in the service of guarding the prisoners till the end < the war, should be credited to the quota of Virginia. The lai guage of the resolution is as follows :
uResolved, That for the ensuing campaign the States 1 respectively required to furnish by draughts or otherwise, on < before the first day of April next, their respective deficiencic of the number of 35,211 men, exclusive of commissioned officer which Congress deem necessary for the service of the presei year.
K That the quotas of the several States be as follows:
New Hampshire. 1,215
Massachusetts Bay.... 6,070
Bhode Island. 810
Connecticut. 3,238
New York. 1,620
New Jersey.1,620
Pennsylvania. 4,855
Delaware. 4(
Maryland. 3,21
Virginia. 6, 0'
North Carolina. 3,6'
South Carolina. 2,4i
[exclusive of black
“ That all the men whose times of service do not expire before t last date of September next be counted towards the quotas of tl States to which they respectively belong, whether they compo the battalions in the line of the several States, those of the a ditional corps, ineluding the Guards, the artillery and horse, the regimented artificers in the departments of the quartí master-general and commissary-general of military stores, wh being credited to the States respectively, should be providi for, deemed, and treated in the same manner with the men the several State lines; and it is recommended to the sever States to make like provision for the officers and men of t artillery, horse, additional corps, including the Guards and rej mental artificers, as may be made in pursuance of any resoluti of Congress, for the officers and men of their respective batti ions$ with such exceptions, respecting the regimented artifice] as have been made by Congress in their acts concerning then (Resolution 9th February, 1780, 3 Jour. Cong., 432.)
The first purpose of the resolution was manifestly to fix ai determine the number of men which each State should contri ute. The second likewise related to State quotas, being declaration that all of the men whose terms of service wou not expire before the last of September following should credited to their respective States, accompanied by a pled *531 that tbe meu (not tbe officers and men) of certain irregular organizations, “including tbe Guards,” “should be provided for, leemed, and treated in the same manner” as tbe men in tbe ine. Tbe third provision was a recommendation to tbe States ;i to make like provision for tbe officers and men” of tbe desig-lated irregular corps, “including tbe Guards,” as might be nade “ for tbe officers and men of their respective battalions.” Tn tbe first provision tbe Guards were referred to as a corps svhioh bad, or which might have bad, men who should be cred-ted on tbe quota of Virginia; in tbe third the officers and men if tbe Guards are designated as among those for whom tbe States should make tbe same provision which they would make “in pursuance of any resolution of Congress” for tbe officers md men of their respective battalions.
It is true that tbe language of tbe resolution does seem to indicate that then, on tbe 9th February, 1780, there were men in tbe Guards “whose times of service do not expire before tbe last late of September next.” But it is also true that the words “including tbe Guards,” in tbe first provision, may have been intended merely as a comprehensive, sweeping clause, equivalent to saying that all men whose times of service did not expire, in whatever corps they might be found, should be counted upon tbe quota of Virginia; and that tbe same words in tbe third provision were intended as new legislation, as a special provision to classify tbe Guards, who were continuing to serve beyond then’ times of enlistment with men whose enlistments would not expire “before tbe last date of September next.”
Be that as it may, we cannot accept tbe ambiguous phraseology of tbe resolution as authoritatively fixing tbe desired fact that tbe Guards, or a portion of them, bad re-enlisted for tbe war, and were liable to be reduced and consolidated under tbe resolutions, which followed in October of the same year. It was proper and just that these officers and men should be thus provided for; but it does not follow that such a recognition establishes tbe fact that they stood on tbe same basis of enlistment for tbe war and for service in tbe field that tbe troops of tbe [ine stood upon.
Finally, tbe depreciation pay, which, under tbe resolution 10 ih April, 1780, was only to be given to persons who “bad engaged to serve during tbe war or for three years,” may well have been allowed to Colonel Taylor as a supernumerary officer in actual *532 service by virtue of the terms of Ms original enlistment. Bn whatever the theory upon which it was allowed, we cannot infe from it the fact that Colonel Taylor’s regiment, in whole or i: part, had re-enlisted for the war, and that he had been reduce* under the resolutions of October, 1780. Upon the whole of th evidence we must rule that it is insufficient to sustain a verdici and that we are not at liberty, wdien sitting in the stead of jury, to pass upon it or to deduce ultimate facts from it.
It is proper to notice the fact that the claimant also rests hi case upon the Act 5th July, 1832 (4 Stat. L., 563). That statut was intended to reimburse the State of Virginia for certain judg ments which had been rendered against the State in her owj courts by officers for half-pay, and to pay directly, wifchou waiting for judgments to be recovered against the State, simila claims covered by the decision of the Virginia courts in Lilley's Case (1 Leigh, 529, &c.). The first section of that act is limite* to officers commanding in the “Virginia line”; the second refer to certain regiments and corps specifically designated by name and does not specify the Albemarle G-uards; the third direct the Secretary of the Treasury “ to adjust and settle those claims of officers “of the aforesaid regiments and corps which have no been paid or prosecuted to judgments against the State of Vii ginia.” We are of the opinion that the benefits of the third sec tion are clearly limited to the regiments and corps enumerate* in the second section, and cannot be extended to the officers o other regiments or corps, though they may have a valid clain for half-pay against that State.
The judgment of the court is that the claimant’s petition b dismissed.