# WILLIAMS v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 46. Argued October 31, November 3, 1890 — Decided November 17, 1890.

The Court of Claims disallowed the claim of the administrator *de bonis non* of Colonel Francis Taylor, for five years' full pay to Taylor, as a colonel of infantry, under the resolution of the Continental Congress of March 22. 1783, (4 Jour. Cong. 178,) holding that he was not in the military service, in the continental line, to the close of the war of the Revolution in 1783. This court affirms the judgment.

Nor was Colonel Taylor entitled to half pay for life under the resolutions of
  . October 3 and 21, 1780, (3 Jour. Cong. 532, 538,) because he was not a
  " reduced " officer.
He was not entitled to recover under the provisions of the act of Congress
  of July 5, 1832, (4 Stat. 563.)
Under § 906 of the Revised Statutes, the decision of the governor of Vir-
  ginia, made under the act of that State, of March 11, 1834, (Laws of
  1834, c. 6, p. 22,) that Colonel Taylor was a " colonel in the continental
  . line from October 1, 1775, to the close of the war," is not either obliga-
  tory in law, or conclusive as evidence, against the United States.
The Court of Claims did not err in refusing to find that Colonel Taylor
  " was an officer in the continental service on the 22d day of March, 1783,
  and continued therein as such officer to the end of the war," whether that
  was a conclusion of fact or one of law.

THE case is stated in the opinion of the court.

*Mr. George S. Boutwell* and *Mr. P. E. Dye* for appellant.

*Mr. Assistant Attorney General Parker* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is an appeal from a judgment of the Court of Claims,
dismissing the petition of John G. Williams, administrator *de
bonis non* of Francis Taylor, against the United States.

The original petition was filed by George Taylor Jenkins
and others, December 8, 1865. After a traverse and an
amended petition, an answer was filed to the latter, and also
a special plea, and the case was submitted to the court, June
10, 1868. On June 15, 1868, a judgment was rendered dis-
missing the petition. A motion for a new trial was made in
December, 1868, and granted in December, 1869. An amended
petition was filed in December, 1877, and a traverse thereto ;
and in February, 1878, the court ordered that John G. Wil-
liams, as administrator *de bonis non* of Francis Taylor, be sub-
stituted as the claimant, and he filed, on the 18th of April,
1878, the petition which is now before us. A traverse was
filed thereto, together with a special plea, to which latter there
was a replication. The court entered a judgment on June 7,
1880, dismissing the petition, and filed certain findings of fact

and conclusions of law, with an opinion, which are set forth in the report of the case, in 15 C. Cl. 514. Those findings embrace identically the findings now before us, to and including finding 10.

. On the 7th of September, 1880, at the same term, the claimant filed a motion for a new trial, on the ground of newly discovered evidence. This motion was held over until the 14th of March, 1887, when the court overruled it, giving an opinion which is reported in 22 C. Cl. 116. It also then substituted new findings of fact and conclusions of law instead of the original ones, (the findings of fact being the same as the original ones to and including finding 10, and adding finding 11.) On the 16th of May, 1887, it made an order which vacated and set aside the judgment of June 7, 1880, and entered a new judgment *nunc pro tunc* as of March 14, 1887, dismissing the petition. The appeal of the claimant is for a review of this last judgment.

The amended findings of fact, with the conclusions of law thereon, are as follows:

"1. Francis Taylor was commissioned captain in the Second State Regiment of the Virginia forces on continental establishment May 8, 1776; he continued in active service, and was promoted and commissioned major in said regiment with rank from July 12, 1778, and he became supernumerary major by the arrangement of the continental army at White Plains in September, 1778.

"2. The regiment, commonly designated as the Albemarle Guards, was originally authorized by the resolution 19th December, 1778, of the House of Delegates of the State of Virginia, but was taken up on continental establishment under and by virtue of the resolution 9th January, 1779 (3 Jour. Cong. 179). From the 9th January to the 5th March, 1779, Francis Taylor was in command of the regiment as lieutenant-colonel. On March 5, 1779, he was commissioned as colonel by the Governor of Virginia, and as such commanded said battalion up to the 15th day of June, 1781, when the battalion was disbanded by the discharge of such men as were enlisted to serve only during the continuance of the convention prisoners in the State of Virginia.

" 3. There is no evidence showing that Colonel Francis Taylor ever resigned his commission in the continental service, or that he was ever otherwise than ready and willing to render service in the same or higher grade when required so to do.

" 4. The acceptance of the Virginia line, and officers, of the commutation offered under the resolution of Congress of March 22, 1783, was made and duly reported as required by the resolution.

" 5. Colonel Francis Taylor died on or about the 16th day of November, 1799.

" 6. Colonel Francis Taylor was not paid the half-pay for life under the resolution of Congress of October 21, 1780, and no commutation certificate was issued to him or his heirs in lieu thereof.

" 7. Colonel Francis Taylor, during his lifetime, and his heirs and legal representatives since, have made frequent and continuous application to the government and to Congress for the payment of this claim up to the time of bringing this suit; and on the 22d day of January, 1859, a memorial to Congress praying its payment was referred by the House of Representatives to this court for adjudication.

" Which resolution is in the words following:

" 'Ordered, That the petitions and papers in the cases of Dr. Charles Taylor, Colonel Francis Taylor, and James Broadus be withdrawn from the files of the House and referred to the Court of Claims.' House Journal, 1858–'59, p. 241.

" 8. It appears, and the court finds the fact to be, that on the 5th March, 1779, Lieutenant-Colonel Taylor, then commanding the regiment known as the Albemarle Guards, was commissioned as colonel by the Governor of Virginia, and that he continued to command the regiment with the rank of colonel until it was disbanded. It further appears that the regiment continued in the continental service after the expiration of the year's service designated in the resolution of 9th January, 1779 (3 Jour. Cong. 179), and until the 15th June, 1781, when the regiment was disbanded. It further appears that on the 13th February, 1781, while the Baron Steuben was acting as inspector-general of the continental forces, and

was charged with the duty of consolidating and reducing the regiments of the line furnished by Virginia, under the resolutions of 3d and 21st October, 1780 (3 Jour. Cong. 532, 538), Mr. Jefferson, then Governor of Virginia, addressed the following official communication to Colonel Taylor:

"'RICHMOND, *Feb.* 13, 1781.

"'SIR: . . . Congress having determined newly to model their forces, the Baron Steuben is now here on that business.

"'The Assembly have directed the Executive to have the same done as to the State troops.

"'Your regiment, being in the continental service, will be submitted to Baron Steuben. Till this be done, which, however, will be done in a few days, no promotions can take place.' . . .

"And on the 14th March, 1781, Mr. Jefferson, as Governor of Virginia, likewise addressed the following official communication to Colonel Taylor:

"'In COUNCIL, *March* 14, 1781.
"'Col. F. TAYLOR.

"'SIR: Before this comes to hand Col. Wood will have received orders to carry the conventioners to Knowland's Ferry, thence to be guarded by the State of Maryland.

"'At that place, therefore, you will please to discharge such of your regiment as were enlisted to serve only during the continuance of the conventioners in Albemarle or in this State.' . . .

"It also appears that Mr. Jefferson, while Governor of Virginia, on the 28th of November, 1779, addressed the following communication to the commander-in-chief:

"'WILLIAMSBURG, *November* 28, 1779.
"'To his Excellency General WASHINGTON:

"'SIR: Your Excellency's letter on the discriminations which have been heretofore made between the troops raised

within this State and considered as part of our quota, and those not so considered, was delivered me four days ago. I immediately laid it before the assembly, who thereupon came to the resolution I now send you.

"'The resolution of Congress of March 15, 1779, which you were so kind as to inclose, was never known in this State till a few weeks ago, when we received printed copies of the Journal of Congress.

"'It would be a great satisfaction to us to receive an exact return of all the men we have in continental service who come within the description of the resolution, together with our State troops in continental service. Colonel Cabell was so kind as to send me a return of the continental regiments commanded by Lord Stirling, of the First and Second Virginia State regiments, and of Colonel Gist's regiment.

"'Besides these are the following, viz.: Colonel Harrison's regiment of artillery, Colonel Baylor's horse, Colonel Bland's horse, General Scott's new levies, part of which are gone to Carolina and a part are here. Colonel Gibson's regiment stationed on the Ohio, Heath and O'Hare's independent companies at the Stomel station, Colonel Taylor's regiment of guards to the convention troops, of these we have a return.

"'There may possibly be others not occurring to me.

"'A return of all these would enable us to see what proportion of the continental army is contributed by us.' . . .

"It further appears that no official records are known to exist which set forth the grounds upon which Colonel Taylor was commissioned as Colonel of the Albemarle Guards on the 5th March, 1779; nor any official record which would explain the reason why the said regiment continued in service beyond the year for which it was enlisted under the resolution of 9th January, 1779; nor any official record which would show whether the said regiment or a portion of it did or did not re-enlist for the war under the resolution of January 23d, 1779 (3 Jour. Cong. 190); nor any official record which would show whether a portion of the said regiment continued in service after the regiment was disbanded on the 15th June, 1781; nor

any official record which would show that Colonel Taylor was discharged from the service when his regiment was disbanded.

"But it appears from an ancient writing found in the public archives of the State of Virginia, purporting to be the proceedings of 'a board of field officers, begun at Chesterfield, February 10, 1781, by order of Major-General Baron Steuben, for the purpose of arranging the Virginia line,' that the regiments reduced in the State of Virginia under the resolutions 3d and 21st October, 1780 (3 Jour. Cong. 532–8), were the eleven regiments of the Virginia line and one regiment of artillery, the former during the month of February being reduced to eight regiments; and that the only colonels mentioned in the said proceedings as reduced were Colonels William Heath and Abraham Buford, two of the twelve regiments being at the time without colonels. It does not appear that any other reduction of Virginia troops took place under the resolutions 3d and 21st October than that at Chesterfield; nor does it appear that the regiment known as the Albemarle Guards was reduced by the Baron Steuben or by any other official authority under the resolutions aforesaid. The ancient writing referred to is among the official papers of the first auditor's office of the State of Virginia; it is not signed or authenticated by any person, but was placed among the official records not long subsequent to the proceedings of the board, and has always been treated by the officers having it in charge as an authentic record of the proceedings of the board.

"9. No certificate of indebtedness, as prescribed by the resolution March 22, 1783 (4 Jour. Cong. 178), was ever issued to Colonel Taylor by the superintendent of finance for the commutation of five years' full pay, instead of the half-pay for life given to officers of the continental army by the previous resolution, October 21, 1780; nor by the Paymaster-General, as prescribed by the resolution 4th July, 1783 (4 Jour. Cong. 237).

"On the 30th July, 1783, the State of Virginia, by the auditor of public accounts, pursuant to an act of assembly, passed at the November session, 1781 (10 Hening Stats. Va. 462), settled the account of Colonel Taylor for the balance of his full pay, commonly known as 'depreciation pay,' and issued

to him evidence of indebtedness for £679 19s. 2d., this being for his services as lieutenant-colonel from the 24th December, 1778, to the 5th March, 1779; and for his services as colonel from the 5th March, 1779, to the 15th June, 1781. And at various times subsequent to the 27th November, 1783, the State of Virginia, by the proper officers, issued to Colonel Taylor land warrants for eight years of service as an officer in the continental army.

"The foregoing payment of the State of Virginia of £679 19s. 2d. was one of the payments of that State to continental officers subsequently assumed and refunded to the State by the United States. On the 4th of February, 1850, the Commissioner of Pensions issued to the administrator of Colonel Taylor's estate a land warrant for services as colonel in the continental army.

"10. The five years' full pay authorized by the resolution 22d March, 1783 (4 Jour. Cong. 178), amounted, for a colonel of infantry, to the sum of $4500.

"11. On the 19th day of March, 1834, John H. Smith, commissioner, reported to the Governor of the Commonwealth of Virginia, in the case of the heirs of Francis Taylor, in the following words:

"'*Heirs of Francis Taylor, Colonel Continental.*

"'Colonel Taylor has received land for a service of eight years as major.

"'He was colonel in the continental service and ought to have been allowed land in that character.

"'There is no proof of his being entitled to land for a longer time than eight years.

"'His heirs are entitled to the difference between the bounty to a colonel and that to major for a service of eight years.

"'This claim has been reported in List No. 2, which has been printed by order of the House of Delegates.

"'Respectfully submitted,        JOHN H. SMITH,

"'*March 19th*, 1834.                *Com'r, &c.*

"'To His Excellency Governor FLOYD.'

" The name of Francis Taylor was reported with the rank of colonel in the continental line for a service of eight years by John H. Smith, commissioner, in List No. 2, 'of officers of the Virginia Continental and State Lines,' &c., 'whose names appear on the Army Register,' and that said List No. 2 was reported by the governor in his message to the House of Delegates of the Commonwealth of Virginia, and was by them ordered printed in 1834, as Executive Doc. No. 31.

" Subsequently the Governor of the Commonwealth of Virginia rendered his decision on the report of the commissioner in the case of the heirs of Francis Taylor in the following words:

" ' To the heirs of Francis Taylor for his services as colonel in the continental line from October 1, 1775, to the close of the war :

" ' *Ordered,* That the register issue warrants accordingly, if not already drawn.'

" And upon the foregoing findings of fact the court decides as conclusions of law: —

" (1.)  The foregoing circumstantial facts set forth in finding 8, taken in connection with the contemporary resolutions of the Continental Congress and the historical events of the war occurring during the same period, are not sufficient evidence to authorize or sustain a finding of the ultimate fact that a portion of the soldiers of Colonel Taylor's regiment of guards re-enlisted for the war and became soldiers in the continental service without the limitations attached to their original enlistment under the resolution 9th January, 1779.

" (2.)  The facts set forth in all of the findings are not sufficient to authorize or sustain a finding of the ultimate fact that Colonel Taylor's regiment of guards was reduced on the 15th June, 1781, under and in pursuance of the resolutions 3d and 21st October, 1780.   3 Jour. Cong. 532–8.

" (3.)  The claimant, upon the foregoing findings, is not entitled to judgment under and by virtue of the provisions of the act 5th July, 1832.   4 Stat. 563.

" (4.) The report of the commissioner of the State of Virginia set forth in finding 11, though approved and adopted by the Governor of that State, is neither obligatory in law, nor conclusive as evidence, against the United States."

On the 14th of March, 1887, after the 11th finding of fact had been filed, the claimant moved to amend it by prefixing thereto the following:

" On the 11th day of March, 1834, the General Assembly of the Commonwealth of Virginia passed an act in these words:

" ' *Be it enacted by the General Assembly*, That John H. Smith be, and he is hereby, appointed and constituted a commissioner, whose duty it shall be to continue the examination directed under a resolution of the General Assembly of the 21st day of February, 1833, touching the revolutionary documents of this Commonwealth, and he shall lay before the Governor any information he may discover as to any unsatisfied revolutionary claims of this Commonwealth on the government of the United States.

" ' It shall, moreover, be the duty of the said commissioner to examine all claims for military land bounties, not heretofore decided on, which may arise under any existing law or resolution of the General Assembly, and report the facts relating to the same, together with any remarks which he may deem pertinent and proper, to the Governor of this Commonwealth, whose decision thereupon shall be final.' "

The court made on this application the following ruling: " Inasmuch as the Supreme Court takes judicial cognizance of statutes, State as well as National, and the practice of finding State laws would be an inconvenience, this request is refused."

At the same time the claimant asked the court to find the following fact: " 12. Colonel Francis Taylor was an officer in the continental service on the 22d day of March, 1783, and continued therein as such officer to the end of the war." On that application the court made the following ruling: " Inasmuch as this finding involves a deduction from specific facts and circumstances which, so far as they are established by the

evidence, are set forth in the previous findings, and really involves a conclusion of law, it is refused."

The claim of the plaintiff now made before us is for the sum of $4500, being the amount of five years' full pay to Colonel Francis Taylor as a colonel of infantry, as being authorized by the resolution of the Continental Congress of March 22, 1783, (4 Jour. Cong. 178,) mentioned in finding 10, with interest thereon from September 3, 1783, the date of the final treaty of peace between the United States and Great Britain, at the rate of six per cent per annum, amounting in the aggregate to $32,310. This claim is founded upon the view that Colonel Taylor was in the military service, in the continental line, to the close of the war of the Revolution in 1783.

The resolution of Congress of March 22, 1783, was as follows : "Whereas the officers of the several lines under the immediate command of His Excellency General Washington, did, by their late memorial transmitted by their committee, represent to Congress, that the half-pay granted by sundry resolutions was regarded in an unfavorable light by the citizens of some of the States, who would prefer a compensation for a limited term of years, or by a sum in gross, to an establishment for life ; and did, on that account, solicit a commutation of their half-pay for an equivalent in one of the two modes above mentioned, in order to remove all subject of dissatisfaction from the minds of their fellow-citizens ; and whereas Congress are desirous, as well of gratifying the reasonable expectations of the officers of the army, as of removing all objections which may exist in any part of the United States, to the principle of the half-pay establishment, for which the faith of the United States hath been pledged ; persuaded that those objections can only arise from the nature of the compensation, not from any indisposition to compensate those whose services, sacrifices, and sufferings have so just a title to the approbation and rewards of their country :

" *Therefore, resolved,* That such officers as are now in service, and shall continue therein to the end of the war, shall be entitled to receive the amount of five years' full pay in money, or securities on interest at six per cent per annum, as Congress

shall find most convenient, instead of half-pay promised for life, by the resolution of the 21st day of October, 1780; the said securities to be such as shall be given to other creditors of the United States, provided it be at the option of the lines of the respective States, and not of officers individually in those lines, to accept or refuse the same; and provided, also, that their election shall be signified to Congress through the commander-in-chief from the lines under his immediate command, within two months, and through the commanding officer of the Southern army, from those under his command, within six months from the date of this resolution:

"That the same commutation shall extend to the corps not belonging to the lines of particular States; and who are entitled to half-pay for life as aforesaid; the acceptance or refusal to be determined by corps, and to be signified in the same manner, within the same time as above mentioned:

"That all officers belonging to the hospital department, who are entitled to half-pay by the resolution of the 17th day of January, 1781, may collectively agree to accept or refuse the aforesaid commutation, signifying the same through the commander-in-chief within six months from this time; that such officers as have retired at different periods, entitled to half-pay for life, may collectively, in each State of which they are inhabitants, accept or refuse the same; their acceptance or refusal to be signified by agents authorized for that purpose, within six months from this period; that with respect to such retiring officers, the commutation, if accepted by them, shall be in lieu of whatever may be now due to them since the time of their retiring from service, as well as of what might hereafter become due; and that so soon as their acceptance shall be signified, the superintendent of finance be, and he is hereby, directed to take measures for the settlement of their accounts accordingly, and to issue to them certificates bearing interest at seven per cent. That all officers entitled to half-pay for life not included in the preceding resolution may also collectively agree to accept or refuse the aforesaid commutation, signifying the same within six months from this time."

Opinion of the Court.

The resolution of October 21, 1780, (3 Jour. Cong. 538), referred to in the resolution of March 22, 1783, was preceded by another resolution of October 3, 1780 (3 Jour. Cong. 532). The material provisions of these resolutions are set forth in the opinion of the Court of Claims, 15 C. Cl. 514, in the terms contained in the margin.[1]

---

[1] "The Continental Congress, by the *Resolutions 3d October* and *21st October*, 1780, (3 Jour. Cong. pp. 532, 538,) determined to reorganize the army in a manner which would involve the consolidation or reduction of regiments. The army, which was to be reduced, as designated by the resolutions, then consisted of sixteen 'additional regiments,' some or all of which had not been 'annexed to the line' of any 'particular State,' of certain specifically-named irregular battalions and light corps, and of eighty battalions, known as the continental line. As to the 'sixteen additional battalions,' and the irregular battalions specifically named, the resolutions directed that they ' be reduced,' and the non-commissioned officers and privates 'be incorporated with the troops of their respective States.' This provision related to troops which had been raised directly by Congress, and its purpose was threefold — to sweep them out of existence as organizations, to transfer the men to the regular regiments of the continental line, and to credit them to the quotas of their respective States.

"The resolutions next provided for the further reorganization of the army at large — of the continental line. So far as this case is concerned, it is sufficient to say that they provided, in effect, that the eleven regiments in the line furnished by Virginia should be reduced to eight, and that no mention of the Albemarle Guards is made in the resolutions.

"Having thus provided for the transfer of men and reduction of regiments, the resolutions further declared with regard to the officers who would necessarily be thrown out by the reduction:

"'And whereas, by the foregoing arrangement, many deserving officers must become supernumerary, and it is proper that regard be had to them:

"' *Resolved*, That from the time the reform of the army takes place they be entitled to half-pay for seven years, in specie or other current money equivalent, and also grants of land at the close of the war, agreeably to the resolution of the 16th of September, 1776.

"' *Ordered*, That a copy of the foregoing arrangement of the army be sent to the commander-in-chief for his opinion thereon, and that, if there shall appear no material objections, the same be carried into immediate effect.' (Resolution October 3, 1780.)"

"' Congress resumed the consideration of the report of the committee on General Washington's letter of the 11th; and thereupon . . .

"' *Resolved*, That the whole of the troops be enlisted during the war, and join their respective corps by the 1st day of January next.

"' That the commander-in-chief and commanding officer in the Southern

It is apparent from the conclusions of law (1) and (2) and the opinion of the Court of Claims, that the question litigated before that court was the ultimate fact, whether a portion of the soldiers of Colonel Taylor's regiment of Albemarle Guards (which regiment was· originally raised for a service of one year, and was disbanded June 15, 1781) re-enlisted for the war and became soldiers in the continental service, without the limitations attached to their original enlistment under the resolution of the Continental Congress of January 9, 1779, (3 Jour. Cong. 179.) That resolution was as follows: "*Resolved*, That a battalion, consisting of 600 men, properly officered, be forthwith raised on continental establishment in Virginia, for the space of· one year from the time of their enlistment, unless sooner discharged, under the direction of the governor and council of that State, who are hereby empowered to appoint the officers of the said battalion out of those of the Virginia line who have been left out of the late arrangement of the continental army, as far as their numbers will reach; the regiment to consist of one lieutenant colonel commandant and captain, one major and captain, six captains, one captain lieutenant, seven lieutenants, nine ensigns, one surgeon, one surgeon's mate, eight companies of 75 men each, including corporals, three sergeants, one drum and one fife to each company :

"That these troops be stationed at, and not removed (except to such distances as the duty of the post may require) from the barracks in Albemarle County, as guards over the convention troops; that they receive the usual pay of the continental army, and a suit of clothes as a bounty to each non-commissioned officer and private :

"That as soon as the said regiment shall be so far completed

---

Department direct the officers of each State to meet and agree upon the officers for the regiments to be raised by their respective States, from those who incline to continue in the service; and where it cannot be done by agreement, to be determined by seniority, and make return of those who are to remain, which is to be transmitted to Congress, together with the names of the officers reduced, who are to be allowed half-pay for life.' (Resolution October 21, 1780.) "

as to be able to do the duty of the post, the militia now in the service there be discharged."

It also appears that the further question was litigated, whether the court was authorized to find the ultimate fact that the regiment of guards, when it was disbanded on the 15th of June, 1781, was "reduced," within the terms of the resolutions of October 3 and 21, 1780.

The opinion of the Court of Claims says of the claim in suit that it "has regretfully reached the conclusion that the moral probabilities on which it rests do not constitute such a foundation of circumstantial evidence as would sustain a verdict in a suit at *nisi prius*, or authorize a judgment in this court."

It further says: "During the period of the revolution the term muster-out was not used, and troops, either individually or as organizations, are spoken of as 'discharged' when dismissed from the continental service. A regiment broken up and consolidated is spoken of as 'reduced,' and officers who were thereby thrown out and became unattached were designated as 'supernumeraries.' The consolidated regiments, moreover, are variously designated as 'the new arrangement,' the 'new establishment,' the 'newly constructed corps,' etc. As to the term 'disbanded,' it seems to have had no technical significance. When a regiment was disbanded some of its soldiers may have been discharged and some transferred to other regiments, the term denoting simply the dissolution of the regiment."

The opinion says, that Francis Taylor, who was then a major and supernumerary officer, thrown out by the consolidation of regiments in 1778, known as the White Plains arrangement, and liable to be called into service on the one hand and entitled to half-pay for life on the other, was assigned to the command of the Albemarle Guards with the rank of lieutenant-colonel, that body being a regiment raised for the purpose of guarding the captured army of General Burgoyne, known as "the convention troops," the duty of guarding whom had been assigned to the State of Virginia; and that Francis Taylor was commissioned as colonel of the

regiment by the Governor of Virginia on the 5th of March, 1779. It also says, that the regiment of guards was not designated in direct terms in the resolutions of October 3 and 21, 1780, nor embraced in any general classification contained in those resolutions; that it was raised for the space of one year from the time of enlistment, unless sooner discharged; that it was to be "stationed at and not removed (except to such distances as the duty of the post may require) from the barracks in Albemarle County, as guards over the convention troops;" that if it continued on that basis until it was discharged in June, 1781, its officers did not become supernumeraries under the resolutions of October 3 and 21, 1780, for reorganizing the continental army; that the guards would have passed out of existence before the time for reorganization arrived; and that, as originally constituted, it had no enlisted soldiers who could be transferred to the regiments of the line, because its soldiers were enlisted for a limited period and for a limited, designated service, which service was to be rendered within prescribed, narrow, territorial limits. The opinion states the question to be, therefore, whether the guards, or a portion of them, had re-enlisted for the war, under the resolution of Congress of January 23, 1779, (3 Jour. Cong. 190,) and became reduced, or consolidated with other regiments, under the resolutions of October, 1780.

The resolution referred to, of January 23, 1779, was "that the commander-in-chief be authorized and directed to take the most effectual measures to reinlist for the continuance of the war, all such of the continental troops as are not expressly engaged for that period," and it promised new bounties and rewards "to each able-bodied soldier now in the service and who shall voluntarily reinlist during the war."

The opinion then proceeds to consider the arguments adduced on the part of the claimant to show that the soldiers of the guards did re-enlist, and in regard to those arguments says: "The circumstances and coincidences so much relied upon, though they might appeal strongly, as establishing a moral probability, to a body possessed of legislative discretion, do not rise to the standard of legal evidence and are insuffi-

cient to authorize a judgment or sustain a verdict. No authenticated document nor official record has been produced to show that a single soldier of Colonel Taylor's regiment had re-enlisted for the war, or was liable to serve beyond the limits of the State of Virginia, or could have been transferred to regiments of the line, under the resolutions. No such averment was made by Colonel Taylor himself in his petitions to Congress and the house of delegates, nor is it alluded to in any contemporary report, letter or communication. Neither the house of delegates, in 1783, nor the Secretary of War, General Knox, in 1791, regarded the Albemarle Guards as one of the regiments which had been reduced and consolidated under the resolutions of 1780; and the silence of the resolutions themselves, with all their particularity as to other commands, indicates that the Continental Congress were not aware of there being soldiers in the guards who were liable to be transferred to the line. Moreover, the time when the regiment was disbanded, June 15, 1781, was subsequent to the consolidation of the Virginia regiments by the Baron Steuben, (February,) and the apparent cause of disbandment was not its consolidation with other regiments, but the termination of the service or duty for which it had been raised and on which it had been exclusively engaged. The mention of the guards in the resolutions 9th February, 1780, (3 Jour. Cong. 432,) and in the correspondence of Mr. Jefferson with General Washington, on which great stress was laid in the argument, was applicable to the regiment, whether its soldiers had re-enlisted or not; for it was proper and just that its soldiers, who were continuing in service beyond the period of their enlistment, and who, in all seeming likelihood, were to continue in the service of guarding the prisoners till the end of the war, should be credited to the quota of Virginia."

The opinion then gives the language of the resolutions of February 9, 1780, which are set forth in the margin,[1] and pro-

---

[1] "*Resolved,* That for the ensuing campaign the States be respectively required to furnish, by draughts or otherwise, on or before the first day of

ceeds : " The first purpose of the resolutions was manifestly
to fix and determine the number of men which each State
should contribute.· The second likewise related to State quo-
tas, being a declaration that all of the men whose terms of
service would not expire before the last of September follow-
ing should be credited to their respective States, accompanied
by, a pledge that the men (not the officers and men) of certain
irregular organizations, ' including the guards,' ' should be pro-
vided for, deemed, and treated in the same manner' as the
men in the line.   The third provision was a recommendation
to the States ' to make like provision for the officers and men '
of the designated irregular corps, ' including the guards' as
might be made ' for the officers and men of their respective
battalions.'   In the first provision the guards were referred to
as a corps which had, or which might have had, men who
should be credited on the quota of Virginia; in the third the

April next, their respective deficiencies of the number of 35,211 men, exclu-
sive of commissioned officers, which Congress deem necessary for the ser-
vice of the present year.
    " That the quotas of the several States be as follows :

| | |
|---|---|
| New Hampshire.............1,215 | Delaware................. 405 |
| Massachusetts Bay...........6,070 | Maryland.....................3,238 |
| Rhode Island....:.......... 810 | Virginia...................6,070 |
| Connecticut.................3,238 | North Carolina...............3,640 |
| New York...................1,620 | South Carolina ..............2,430 |
| New Jersey.................1,620 | [exclusive of blacks.] |
| Pennsylvania................4,855 | |

    " That all the men whose times of service do not expire before the last
date of September next be counted towards the quotas of the States to
which they respectively belong, whether they compose the battalions in the
line of the several States, those of the additional corps, including the
guards, the artillery and horse, or the regimental artificers in the depart-
ments of the quartermaster general and commissary general of military
stores, who, being credited to the States respectively, should be provided
for, deemed and treated in the same manner with the men in the several
State lines; and it is recommended to the several States to make like pro-
vision for the officers and men of the artillery, horse, additional corps,
including the guards and regimented artificers, as may be made in pursuance
of any resolution of Congress, for the officers and men of their respective
battalions; with such exceptions, respecting the regimented artificers, as
have been made by Congress in their acts concerning them."

officers and men of the guards are designated as among those for whom the States should make the same provision which they would make 'in pursuance of any resolution of Congress' for the officers and men of their respective battalions. It is true that the language of the resolutions does seem to indicate that then, on the 9th February, 1780, there were men in the guards 'whose times of service do not expire before the last date of September next.' But it is also true that the words, 'including the guards,' in the first provision, may have been intended merely as a comprehensive, sweeping clause, equivalent to saying that all men whose times of service did not expire, in whatever corps they might be found, should be counted upon the quota of Virginia; and that the same words in the third provision were intended as new legislation, as a special provision to classify the guards, who were continuing to serve beyond their times of enlistment, with men whose enlistment would not expire 'before the last date of September next.' Be that as it may, we cannot accept the ambiguous phraseology of the resolutions as authoritatively fixing the desired fact that the guards, or a portion of them, had re-enlisted for the war, and were liable to be reduced and consolidated under the resolutions which followed in October of the same year. It was proper and just that these officers and men should be thus provided for; but it does not follow that such a recognition establishes the fact that they stood on the same basis of enlistment for the war and for service in the field that the troops of the line stood upon."

Referring to the fact of the "depreciation pay" which Colonel Taylor received for the time he served as colonel of the guards, from March 5, 1779, to June 15, 1781, under the resolution of Congress of April 10, 1780, (3 Jour. Cong. 447,) which provided that "no person shall have any benefit of this resolution, except such as were engaged during the war, or for three years, and are now in service," the opinion says: "Finally, the depreciation pay, which, under the resolution 10th April, 1780, was only to be given to persons who 'had engaged to serve during the war, or for three years,' may well have been allowed to Colonel Taylor, as a supernumerary offi-

cer in actual service, by virtue of the terms of his original enlistment. But whatever the theory upon which it was allowed, we cannot infer from it the fact that Colonel Taylor's regiment, in whole or in part, had re-enlisted for the war, and that he had been reduced under the resolutions of October, 1780. Upon the whole of the evidence we must rule that it is insufficient to sustain a verdict, and that we are not at liberty, when sitting in the stead of a jury, to pass upon it or to deduce ultimate facts from it."

In the report of the case on the motion for a new trial, 22 C. Cl. 116, it is stated that the purpose of the motion "is to establish the fact that Colonel Francis Taylor, of the Albemarle Guards, continued in the service of the Continental Congress after the disbandment of his command in June, 1781, until the end of the war." On the argument before this court, the counsel for the claimant contends that his right to recover depends upon the question whether Colonel Taylor continued in the service until the end of the war, or was retired before that time, and thereby became entitled to half-pay for life or to the commutation therefor; that, if it be found that he did not continue in the service until the end of the war, yet if he was retired or "reduced" at any time after October 21, 1780, he was entitled to half-pay for life, under the resolution of that date; that, as he was entitled to half-pay for life as a major in 1778, the burden is upon the United States to show that he did not continue in the service to the end of the war; that it is not shown that he retired from the service in June, 1781, when the regiment was disbanded, or that he again became a supernumerary; that, although the law providing half-pay for life was modified by the resolutions of October 3 and 21, 1780, while he still commanded the guards, yet the only modification was as to the time when the half-pay should begin, the modification being that it should begin at the time the officer was reduced or retired from the service; that this modification was in force in June, 1781, when the guards were disbanded; that under its provisions Colonel Taylor would have been entitled to half-pay for life in his new grade as colonel, to begin from the time the guards were disbanded,

even if he had then retired from the service; that if he had been treated, in June, 1781, as a supernumerary major, he still would have been entitled from that date to half-pay as a major; that there is no evidence that he was reduced in rank; and that he was a colonel in the continental army on the 15th of June, 1781.

In the brief presented to us on this appeal, the counsel for the claimant departs from the questions litigated in the Court of Claims, as shown by the first two conclusions of law and by the opinion of that court, and contends that the issue is as to whether or not Colonel Taylor continued in the service to the end of the war, or retired before that time; and that the ultimate fact to be proved is the duration of his own personal service, and not the duration of the service of any of the soldiers composing the guards. The contention appears to be that, under the resolutions of October, 1780, a continuous service throughout the war by Colonel Taylor, or his retirement before its close, entitled him to half-pay for life.

But this view is not tenable, because the resolution of October 3, 1780, provided for half-pay for only seven years, and only for those officers who became supernumeraries under the arrangement provided for by that resolution; and the resolution of October 21, 1780, had reference only to the same officers, whose names were to be transmitted to Congress, and who are called therein "officers reduced," that is, in the language of the resolution of October 3, 1780, officers "thrown out by the reduction." Those were the only officers who were by the latter resolution "allowed half-pay for life." It is inaccurate, therefore, to say that the only change made by the resolutions of October, 1780, was as to the time half-pay for life should begin.

Whether Colonel Taylor retired from service at the time the regiment was disbanded, or whether he continued in the service to the end of the war, he was not a "reduced" officer, within the meaning of that term, as used in the resolutions of October, 1780. The scheme of those resolutions did not apply to such organizations as that of the guards, nor to officers who were not "reduced" under those resolutions, although

they should continue in service to the end of the war. An officer who left the service at the end of the war was not "reduced."

The commission of Francis Taylor as colonel came from the Governor of Virginia, and the order to discharge the soldiers of the regiment also, came from him. It was an irregular regiment created for a particular service, and charged with a specific duty, to be performed in a designated locality. Service in the regiment was inconsistent with service in the continental army. Such commission as Francis Taylor held prior to January 9, 1779, was practically revoked by the terms of the resolution of Congress of that date, which authorized the governor and council of the State of Virginia to appoint the officers of the new regiment out of those of the Virginia line who had been "left out of the late arrangement of the continental army;" and by his acceptance of the appointment of lieutenant-colonel of the new regiment. His obligation to serve in the guards disqualified him from continuing as a supernumerary in the continental service. He could not perform duty under his commission as lieutenant-colonel or colonel of the guards, and at the same time hold himself in readiness to respond to a call to the field in the continental service.

The third conclusion of law made by the Court of Claims was that, upon its findings of fact, the claimant was not entitled to judgment under and by virtue of the provisions of the act of July 5, 1832 (4 Stat. 563). In regard to that statute, the court remarks, in its opinion, that it was intended to reimburse the State of Virginia for certain judgments which had been recovered against that State in her own courts, by officers, for half-pay, and to pay directly, without waiting for judgments to be recovered against the State, similar claims covered by the decision in *Lilly's Case*, 1 Leigh, 529; that the first section of that act is limited to officers commanding in the "Virginia line;" that the second section refers to certain regiments and corps specifically designated by name, and does not specify the Albemarle Guards; that the third section directs the Secretary of the Treasury "to adjust and settle those claims" of officers "of the aforesaid regiments and

corps, which have not been paid or prosecuted to judgments against the State of Virginia ; " and that the benefits of the third section are clearly limited to the regiments and corps enumerated in the second section, and cannot be extended to the officers of other regiments or corps, though they may have a valid claim for half-pay against that State. It is said in the brief of the counsel for the claimant that it was never contended by him that that act was anything more than a legislative interpretation of the several resolutions of the Continental Congress which are in question, or that it created any new liability on the part of the United States. We concur in the view of the Court of Claims.

The fourth conclusion of law of that court was, that the report of the commissioner of the State of Virginia, set forth in finding 11, although approved and adopted by the governor of that State, was neither obligatory in law upon, nor conclusive as evidence against, the United States.

The State of Virginia, on the 11th of March, 1834, (Laws of 1834, c. 6, p. 22,) passed an act appointing John H. Smith a commissioner, and making it his duty to continue an examination previously directed touching the revolutionary documents of the State, and to lay before the governor any information he might discover as to any unsatisfied revolutionary claims of the State on the government of the United States; and further making it his duty to examine all claims for military land bounties, not theretofore decided on, which might arise under any existing laws or resolutions of the general assembly, and to report the facts relating to the same, together with any remarks he might deem pertinent and proper, to the governor of the State, " whose decisions thereupon shall be final." The decision of the governor on the report of the commissioner in the case of the heirs of Francis Taylor was made in September, 1850, and speaks of Taylor " as colonel in the continental line from October 1, 1775, to the close of the war." It is contended by the claimant that, under section 906 of the Revised Statutes, this decision of the governor of Virginia is conclusive against the United States, to show that Taylor continued in the continental service until the close of the war.

The provision of section 906 is, that records and exemplifications of books kept in any public office of any State, when authenticated in the manner provided by that section, "shall have such faith and credit given to them in every court and office within the United States as they have by law or usage in the courts or offices of the State" from which they are taken. The Court of Claims, in its opinion overruling the motion for a new trial (22 C. Cl. 116,) states that the clause above quoted from section 906 did not impart to the authenticated State record anything more than "faith and credit," and did not extend the effect of a decision against a State to the United States, nor make an award or judgment which might be final against a State "either obligatory in law, or conclusive as evidence, against the United States." We concur in this view.

It is also alleged for error by the claimant, that the Court of Claims refused to find that "Colonel Francis Taylor was an officer in the continental service on the 22d day of March, 1783, and continued therein as such officer to the end of the war," stating, as the ground of its refusal, that the proposed finding involved a deduction from specific facts and circumstances which, so far as they were established by the evidence, were set forth in the previous findings, and really involved a conclusion of law. The claimant contends that the finding requested was a conclusion of fact drawn from other specific facts and circumstances established by the testimony; that he was entitled to have that conclusion of fact found by the court; that such fact was not a question of law; and that, even if it were, the court erred in not finding it as a conclusion of law.

Perhaps, under the rulings of this court in *United States* v. *Pugh,* 99 U. S. 265, 270; *Sun Mutual Ins. Co.* v. *Ocean Ins. Co.,* 107 U. S. 485, 503; *The Belgenland,* 114 U. S. 355, 362, and *McClure* v. *United States,* 116 U. S. 145, 151, the question involved in the proposed finding which was refused, was a question of law. In *United States* v. *Pugh,* one of the issues to be determined was, whether the proceeds of the sale of certain captured property belonging to the claimant had been paid into the Treasury. No direct

proof to that effect had been given, but, if shown at all, it was by way of inference from certain circumstantial facts established by the evidence and set forth in the findings of the Court of Claims. This court said, that the Court of Claims had found all the facts which had been established directly by the evidence; that those facts were "the results of evidence, and whether they establish the ultimate fact to be reached is, if a question of fact at all, to say the least, in the nature of a question of law;" that the inquiry presented was as to the legal effect of facts proved, not of the evidence given to make the proof; that the question of practice to be settled was whether, under the rule of this court as to appeals from the Court of Claims, the judgment of the latter court as to the legal effect of what might, perhaps not improperly, be called the ultimate circumstantial facts in a case, was final and conclusive, or whether it could be reviewed by this court; that, under that rule, this court could not consider the evidence, but its attention must be confined to the legal effect on the rights of the parties of the facts found by the Court of Claims; and that, in that way, the weight of the evidence was left for the sole consideration of that court, but the ultimate effect of the facts which the direct evidence had established was left open for review here on appeal. But whether the proposed finding which was refused in the present case was a conclusion of law from the facts already found, or an additional conclusion of fact, we are of opinion that the Court of Claims was correct in refusing to find it.

In the opinion of the Court of Claims in 22 C. Cl. 116, it is stated that part of the newly discovered evidence set up as a ground for a new trial consisted of "certain resolves and proceedings of the Continental Congress, and certain resolves of the general assembly of Virginia, and official correspondence in the first and second volumes of the State Papers of Virginia." In regard to these papers the Court of Claims says that it is "of the opinion that if they had been put in evidence on the trial they would not have changed the result." We concur in this view, after having examined the papers.

This case is very much like that of Dr. Charles Taylor, re-

ported as *Williams* v. *United States*, 13 C. Cl. 395. Charles Taylor was a surgeon's mate in the continental army from 1776 to 1778, and then was reduced and became a supernumerary officer. In 1779 he was appointed a surgeon's mate in the regiment of Albemarle Guards, and accepted and held that position. In October, 1779, he was promoted to be surgeon in the regiment, and held that place until the regiment was discharged, June 15, 1781. He claimed five years' full pay as surgeon in the Virginia line of the .continental army, under the same resolutions and proceedings that are now involved in the case of Colonel Francis Taylor. The Court of Claims decided that he could not have full pay as an officer of the guards and at the same time be entitled to half-pay as a reduced and supernumerary officer. The claim was rejected and there was an appeal to this court. The opinion of this court is reported as *Williams* v. *United States*, 25 L. C. P. Co. ed. 309; and 14 C. Cl. 590. It is also referred to as No. 1058 on page ccxxviii of the appendix to 131 U. S. In its opinion, this court, in affirming the judgment of the Court of Claims, said that Dr. Charles Taylor did not continue in service until the end of the war, within the meaning of the resolutions of October 21, 1780, and March 22, 1783 ; that, when he accepted his appointment in the regiment of the guards, in January, 1779, he ceased to be a supernumerary surgeon's mate, and became an active officer in that regiment; that, when it was discharged, because its term of enlistment had expired, he was out of service; that, when it was raised, the governor and council of Virginia were authorized by Congress to appoint its officers out of those in the Virginia line who were then supernumerary ; and that the acceptance of an appointment in the new regiment took the officer out of his former position in the line.

                                    *Judgment affirmed.*